Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 1 of 67

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

PEOPLE OF THE STATE OF NEW YORK,
by LETITIA JAMES, Attorney General of the State of
New York,

                    Petitioner,

      - against -

DAILYPAY, INC.,

                    Respondent.

**VERIFIED PETITION**

Index No. _____

Petitioner People of the State of New York, by Letitia James, Attorney General of the State of New York (the "OAG"), as and for her Verified Petition, respectfully avers:

## INTRODUCTION

1. Beginning when it was still just a colony, decades before declaring Independence, New York adopted usury legislation to protect its most vulnerable residents from high-cost lending that preys on economic fragility and weakened bargaining positions. In the centuries that followed, strengthened prohibitions on usury have been enacted on multiple occasions, including laws that overrode judicially imposed usury limits and the addition of criminal penalties for usury, among other enhancements. This long and unbroken history reflects a clear declaration of public policy by New York's legislature: lending at usurious rates, even where freely entered into, is financially unhealthy and destructive, and therefore is not permitted within the state of New York.

2. Efforts by lenders to circumvent New York public policy are almost as old as the prohibition on high-cost lending itself. New York's highest court "has recognized for more than a century that the economy changes" and that, as these changes occur, new opportunities come about for "lenders to extract unlawful interest rates through novel and increasingly sophisticated

Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 2 of 67

instruments." *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 342 (2021). Thus, the Court of Appeals instructs: "if the court can see that the real transaction was the loan or forbearance of money at usurious interest, its plain and imperative duty is to so declare." *Id*. Embracing this call to action, New York courts have repeatedly applied usury prohibitions to loansharks, payday lenders, and others who exploit New Yorkers through illegal, abusive lending practices.

3.      This action concerns a modern, technology-driven attempt to evade New York's usury laws. In the transactions at issue here, workers obtain small-dollar advances, usually for less than $100, and pay fees of $2.99 or $3.49, reflecting exorbitant and plainly usurious costs of credit. In exchange, workers agree to have their next paycheck deducted to cover all amounts owed before they receive the remaining balance. As collateral, they assign all rights and title to their wages owed and promise to not interfere with repayment. That assigned collateral also is secured by employers' obligations to pay, supported by extensive credit underwriting regarding employers' ability to make payroll. This is secured lending, plain and simple—and usurious lending at that. Such activity contravenes centuries of New York law and policy, and it should be barred.

*                    *                    *

4.      Respondent DailyPay, Inc. ("DailyPay" or "the Company") is a New York-based payday lender that makes small-dollar, short-term, high-cost loans (each, a "Paycheck Advance") to workers nationwide, including tens of thousands in New York. In a typical transaction, an employee obtains around $75 from DailyPay eight days before her payday; then, on payday, DailyPay deducts about $77.99 from her paycheck to recoup amounts lent plus $2.99, an annualized percentage rate, or APR, of nearly 200%. And the single most common loan—a seven-day, $20 Paycheck Advance for $2.99—reflects an APR above 750%. Through transactions like these, DailyPay has extracted tens of millions of dollars in fees from New Yorkers' wages.

2

5.      DailyPay reaches workers by first contracting with their employers, who agree to make the Company their exclusive lender and to tout DailyPay's program as a benefit to their employees. Through these exclusive arrangements, DailyPay obtains real-time payroll data that the Company uses to offer Paycheck Advances in amounts that ensure that it will collect every dollar that it lends out and all fees that it charges. The Company also contracts with employers to send their workers' paychecks directly to DailyPay on payday, from which the Company deducts all amounts it is owed before passing on any remaining balance to employees.

6.      DailyPay partners with employers to promote its Paycheck Advances, which the Company claims will provide workers financial freedom through the ability to obtain pay early— supposedly without interest. DailyPay's marketing materials, which contrast its program with payday lending, tell employees to enroll and download the app for free. DailyPay also promotes employees' ability to get money when needed, such as to cover unexpected expenses or bills, and regularly touts the Company's on-demand Paycheck Advances without mentioning fees.

7.      DailyPay is what has come to be known as an "earned wage access" provider. The Company purports to offer hourly workers who are paid on fixed schedules "early access" to wages that have been "earned" during the pay period but not yet paid. Though terms may vary, these lenders all share certain characteristics: (i) they lend based on real-time payroll data or algorithmic estimates of future deposits; (ii) they charge transaction fees, charge more for loans with terms that begin immediately, or extract tips; and (iii) they carry on as though they are not making loans and not collecting interest because they say that they will not sue or engage in debt collection.

8.      These claims are false, DailyPay's Paycheck Advances are loans, and its fees are interest. Though DailyPay promises that it will not sue or engage in debt collection, the Company has no need to do so. When an employee obtains a Paycheck Advance, she assigns wages to the

Company sufficient to repay her loan and all fees. DailyPay then employs layers of protection—extensive credit underwriting, direct recourse against employers, and employees' obligations to assist in collection—to ensure a collections rate above 99.99%. Even the Company's promise not to sue is illusory, as its loan agreements impose obligations on employees to repay DailyPay when employers pay workers directly or make payroll errors. Employees who fail to make these payments are in breach of their loan agreements, relieving DailyPay of its "no recourse" promise. Meanwhile, workers who obtain Paycheck Advances are saddled with outsized fees that do not correspond to DailyPay's expenses and impose costs that are nearly always greater than 50% APR, including tens of thousands of Paycheck Advances with APRs in excess of 500%.

9.      DailyPay's business model also is fundamentally abusive. The engine that drives DailyPay's revenue and makes the Company profitable is its cultivation of a subset of employees who are utterly dependent on the ability to regularly and repeatedly obtain Paycheck Advances for fees, thereby depleting their future paychecks and making them dependent on access to more loans. DailyPay touts employees' addiction to potential investors, proclaiming that it will be able to consistently extract hundreds of dollars in wages on average each year from hourly workers. And the Company facilitates destructive lending by: (i) obscuring risks of dependency while promising financial freedom; (ii) leaning on exclusive relationships with trusted employers to promote the Paycheck Advance program as a benefit to their employees; and (iii) taking advantage of its right of first access to workers' paychecks to ensure its own repayment while being indifferent to the harm that paycheck depletion causes to employees' overall financial wellbeing.

10.      The facts summarized above and set forth in this Petition are based on: the OAG's review of advertisements, agreements, and produced documents, as well as other publicly available materials, cited as "Ex. __" to refer to exhibits to the accompanying Affirmation of Christopher L.

4

Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 5 of 67

Filburn ("Filburn Aff.'); the sworn testimony of Jane Levine, DailyPay's former chief compliance officer who was designated to provide testimony (cited to throughout as the "Levine Tr."), Filburn Aff. Ex. 2; and data analyses performed on transaction-level data for New York employees from October 1, 2020 to December 31, 2024 (the "Data Period") memorialized in the Affidavit of Akram Hasanov (cited to throughout as the "Hasanov Aff."), Filburn Aff. Ex. 1.

11.     As established herein, DailyPay has continued to engage in repeated and persistent fraud and illegality in violation of New York's Executive Law § 63(12), General Business Law ("GBL") §§ 349 and 350, General Obligations Law § 5-501, Penal Law § 190.40, Personal Property Law § 46-F, and the Consumer Financial Protection Act, 12 U.S.C. § 5531 *et seq.*

## PARTIES, JURISDICTION, AND VENUE

12.     Petitioner Letitia James is the Attorney General of the State of New York.  She is responsible for enforcing New York's laws, including Executive Law § 63(12).

13.     Respondent DailyPay is a Delaware corporation (Ex. 7) with its principal place of business located at 55 Water Street, New York, New York 10041 (Ex. 39).

14.     Petitioner brings this special proceeding on behalf of the People of the State of New York under the authority granted in Executive Law § 63(12), which authorizes the Attorney General to bring a proceeding for injunctive and other equitable relief "[w]henever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business."

15.     Venue is properly set in New York County because Petitioner is resident in New York County and has selected New York County, because Petitioner is a public authority whose facilities involved in the action are located in New York County, and because Respondent's principal place of business is in New York County. *See* CPLR §§ 503, 505, 509.

5

Case 1:25-cv-03439-JGK     Document 1-1     Filed 04/25/25     Page 6 of 67

## FACTS

16.     DailyPay is an app-based lender that makes Paycheck Advances to employees whose employers have enrolled in the Company's program. (Ex. 40; Levine Tr. 17:4–10.).)

17.     DailyPay targets employees who earn hourly wages and are paid on fixed cycles such as every two weeks or monthly, promoting Paycheck Advances as providing "wages" that employees have "earned" during the pay period but not yet received. (Ex. 40.)

18.     Companies that have contracted with DailyPay to provide its Paycheck Advance program to employees include fast food chains such as Burger King and McDonald's, retailers such as Kroger and Target, and healthcare providers such as HCA and United Healthcare (Ex. 17, at 2189; Levine Tr. 201:20–24), many of whom pay wages at or near minimum wage.

19.     DailyPay facilitates Paycheck Advances through an app-based platform that allows employees to obtain funds via electronic transfer from DailyPay to their bank accounts in amounts up to what DailyPay permits based on its analysis of payroll data. (Ex. 31; Ex. 40.)

20.     The fee structure employed by DailyPay varies by employer. (Levine Tr. 159:13–60:5.) The Company today employs the following dual fee structure: DailyPay (i) changes $0.00 to $1.99 for Paycheck Advances with loan terms, meaning the period between payment of the Paycheck Advance and repayment on the next payday, that begin in 24 to 48 hours; and (ii) charges up to $3.99 for Paycheck Advances with terms that begin immediately with immediate disbursement. (Ex. 5, § 2, at 0463). For employees of certain employers, this means that a fee is mandatory whether the employee chooses a Paycheck Advance with a term that begins in 24 to 48 hours or a Paycheck Advance with a term that begins immediately. (*See generally* Ex. 36.)

21.     DailyPay collects the Paycheck Advances it sends employees, along with all associated fees, by requiring employers to route employees' direct deposits to a bank account held

by DailyPay. (Ex. 31.) Once the Company deducts everything it is owed by the employee, DailyPay deposits remaining amounts in employees' bank accounts. (Ex. 31.)

## I.    DailyPay Solicits Employers to Enter into Agreements that Facilitate DailyPay's Marketing and Offering of Paycheck Advances to Employees

22.    To offer Paycheck Advances to employees, DailyPay solicits employers to enroll in its Paycheck Advance program (Levine Tr. 17:11–18:6; 28:18–29:4), after which DailyPay works with employers to market its Paycheck Advance program to employees. (Ex. 40.)

### A.    DailyPay Entices Employers to Enter into Master Services Agreements by Claiming that DailyPay Will Benefit Employers and their Employees

23.    DailyPay's marketing of its Paycheck Advance program targets potential new employers. The Company's website, for example, promises that the program "can help you recruit more employees, increase employee engagement, and improve retention." (Ex. 38.)

24.    DailyPay also circulates a newsletter-like document that markets its Paycheck Advance program to chief financial officers and other senior executives at prospective employers, touting the supposed benefits of the program. (Ex. 32; Levine Tr. 25:5–27:9.)

25.    According to the newsletter, the program "will provide tremendous benefits to the employer – reduced turnover, increased employee productivity and engagement, and seamless integration across the tech stack – all for a price tag of $0 to the business." (Ex. 32, at 0207.)

26.    That same newsletter also warns employers to be wary of DailyPay's competitors who purport to offer free short-term advances to employees who sign up for paycards by pointing to a study that an employee who uses a paycard "typically pays an average of $300/year in cardholder fees" through paycard fees. (Ex. 32, at 0207–0211.)

27.    In other employer-facing ads, DailyPay similarly claims that its program will keep employees "engaged and working more efficiently than ever before.' (Ex. 30, at 0157.) And

7

Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 8 of 67

DailyPay's employer "Quickstart Guide" touts the Company's "life-changing" Paycheck Advance program that will result in "[r]educed absenteeism" among employees. (Ex. 21.)

28.    In addition to benefits that DailyPay promises to employers, the Company also touts supposed benefits to employees. DailyPay tells employers that the Paycheck Advance program will help employees "pay bills on time, meet unexpected expenses and avoid racking up overdraft and late fees or resorting to having to take out predatory payday loans." (Ex. 32, at 0207.) The result, according to the Company, will be a "new financial system that ensures that money is always in the right place at the right time for everyone." (Ex. 30, at 0156.)

29.    DailyPay similarly represents to prospective employers that their "employees will benefit" from the Paycheck Advance program "by having greater financial stability in their lives." (Ex. 32, at 0212.) The Company also claims that nearly all "transfers are used to pay bills and avoid late fees" and that nearly all employes "will receive over half of their paycheck on payday." (Ex. 30, at 0156.) And DailyPay ultimately promises employers that its program "creates permanent and positive changes in financial behavior." (Ex. 30, at 0156.)

30.    Many of DailyPay's claims regarding its Paycheck Advance program rely on a single, 2021 survey conducted by the Aite Group. DailyPay paid for that survey to be conducted. (Ex. 12, at 0283.) The Company also worked closely with the Aite Group to design the survey (e.g., Ex. 12; Ex. 14), while DailyPay management both discussed preliminary conclusions with the Aite Group immediately after the survey (e.g., Ex. 15), and reviewed preliminary drafts of the final report for red flags before distribution (e.g., Ex. 16). Employees who agreed to participate in the survey were promised an opportunity to win $100. (Ex. 11, at 0257.)

31.    The Aite Group's conclusions were based on a single survey of about 1,000 users (Ex. 11, at 0257), a miniscule slice of the more than 2 million users today. Key conclusions were

based on even fewer responses—findings regarding payday loan use, for example, were based on just over 200 users' responses—a *de minimis* fraction of its user base. (Ex. 11, at 0265.) And only 24 employees who participated in the survey were from New York. (Filburn Aff. ¶ 12.) The Aite Group also acknowledged that the earned wage access market was "in its early stages" and that further "efforts to understand usage and outcomes" was needed. (Ex. 11, at 0273.)

**B.    DailyPay Markets to Employees, through their Employers, the Ability to Immediately Obtain Fee- and Interest-Free Paycheck Advances**

32.    Employers who ultimately agree to make DailyPay's Paycheck Advance program available to their employees enter into DailyPay's form Master Services Agreement ("MSA"). (Ex. 6; Levine Tr. 52:16–20; 56:25–57:14.) The MSAs require that DailyPay be the exclusive provider of Paycheck Advances to employers' employees. (Ex. 6, ¶ 7(b), at 0230.)

33.    Under their MSAs, participating employers agree to use "commercially reasonable efforts to promote" DailyPay's Paycheck Advance program to their employees, including by identifying the program as "a benefit" offered by the employer, distributing marketing materials created by DailyPay to the employer's employees, and taking steps to ensure that DailyPay's own advertising and communications sent by email do not get routed to employees' spam or junk email folders. (Ex. 6, ¶ 2(a)(ii), at 0223–24; Levine Tr. 66:9–67:22; *id*. at 108:25–09:10.)

34.    The "Quickstart" guide provided by DailyPay, for example, tells employers to help roll out the program by displaying "posters in break rooms" and handing out "FAQ cards to employees at the beginning of shifts or during team huddles." (Ex. 21.)

35.    DailyPay licenses its marketing materials to participating employers to promote the Paycheck Advance program. (Ex. 6, ¶ 1(a), at 0223.) Through DailyPay materials, employers tell their employees that "[w]e've partnered with DailyPay to give you more control over your pay!" (Ex. 29, at 0135.) The communications describe the benefits as "no more waiting for payday, no

more late fees, and no more interest charges!" and informs employees that they should "[k]eep an eye out for a customized Welcome Email directly from DailyPay." (Ex. 29, at 0136.)

36.     Employers also are provided posters and flyers announcing "DailyPay Coming Soon!" that can be posted in the workplace, along with QR codes that employees can scan to "get a head start and download the free app." (Ex. 18; Levine Tr. 107:5–10.) Other ads displayed in the workplace provide workers with website links to get started with DailyPay. (Ex. 19.)

37.     DailyPay's employee-facing marketing materials also stress the partnership between the Company and the employer. For example, DailyPay's welcome email to potential new users states that DailyPay and the employer "have teamed up so you can control when you get paid." (Ex. 27.) Another DailyPay employee message states that "DailyPay and [Employer Name] have teamed up so you can get paid before payday," describing the Paycheck Advance program as "a new [Employer Name] benefit." (Ex. 28.) And another ad states that DailyPay's Paycheck Advance program is offered "in partnership with your employer.' (Ex. 26.)

38.     DailyPay's employee-facing ads frequently portray the Company's Paycheck Advance program as being free or no cost. For example, one employee-facing ad points employees to DailyPay's "free app" and tells employees to get "started for free today" in order to obtain money "in the right place, at the right time!" (Ex. 20.) DailyPay ads also expressly contrast its Paycheck Advance program with traditional payday loans (Ex. 23):



39.     In addition to the supposedly free or no-cost nature of its Paycheck Advance program, DailyPay also markets the ability for employees to obtain immediate funds through its program. DailyPay's electronic ads to workers, for example, contain links with the words: "Get paid today." (Ex. 24; *see also* Ex. 22 ("Get paid on the SAME DAYS you work").)

40.     Ads for Paycheck Advances posted in the workplace likewise declare: "Access your pay when you need it!" (Ex. 18.) One such poster also includes a screenshot of the DailyPay app that identifies various amounts available for transfer but says nothing about any associated fees. (Ex. 18.) That poster also declares: "Money in the right place, at the right time." (Ex. 18.)

41.     DailyPay similarly markets the ability for a worker to access earnings "when you need it." (Ex. 28.) For example, one ad asks "HAVE TO FUND ANOTHER GROCERY RUN???" and then tells the reader that DailyPay will be able to "save the day." (Ex. 25.)

42.     The combination of DailyPay's marketing of a no cost program and the immediate availability of funds creates a false impression that immediate advances are free. In one flyer provided to employers to share with employees, DailyPay touts the ability to "access your pay on-demand" and declares that employees can get started "for free" (Ex. 19):



11

Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 12 of 67

43.    Template communications that DailyPay provides to employers to use when launching the program similarly tell employees they can "[t]ransfer your earnings instantly when they need it," without any reference to costs. (Ex. 29; Levine Tr. 111:6–12:20.)

44.    And welcome communications to newly enrolled employees highlight the ability to "instantly" transfer funds to bank accounts, stressing the ability to "[a]ccess your money when you need it" without any acknowledgment of the associated costs. (Ex. 27.)

45.    DailyPay's form communications for employers to send to their employees also suggest that the program will allow an employee to "[a]ccess your pay instantly" without mention of fees or costs. (Ex. 29; *see* Ex. 32 ("Instantly transfer your earned pay.").)

46.    And in an electronic ad, DailyPay shows a user obtaining a $100 Paycheck Advance, clicking the "Now" delivery option, and indicating that the reason was to pay a phone bill—all without ever showing any fee incurred. (Filburn Aff. ¶ 10; Exs. 33, 34, 35.)

**II.    DailyPay Profits from its High-Cost, Short-Term Paycheck Advances to Employees**

47.    Employees who enroll in the DailyPay program are presented "Program Terms." (Ex. 3, at 0214.) The Program Terms provide that, by using DailyPay's app to access Paycheck Advances, the employee agrees to be bound by the Program Terms. (Ex. 3, at 0214.) Employees do not physically or electronically sign the Program Terms. (Levine Tr. 140:21–41:13.)

48.    Employees access Paycheck Advances primarily through DailyPay's mobile app. (Ex. 3, at 0214.) Under DailyPay's Program Terms, an employee's "Unpaid Earnings" are equal to her right to payment for regular pay that will be owed to her but has not yet been paid. (Ex. 3, § 10, at 0220.) When accessing the DailyPay app, a worker sees her available balance, which is equivalent to the portion of the worker's Unpaid Earnings that DailyPay, in its sole discretion, will make available as a Paycheck Advance (Ex. 3, § 2, at 0215), as follows (Ex. 18):



49.     To enable DailyPay to calculate Unpaid Earnings and determine available balances in real time, employees who sign up for the Paycheck Advance program consent to their employers sharing payroll data with DailyPay. (Ex. 3, § 3, at 0216.) Employers agree to provide this payroll data to DailyPay in their MSAs. (Ex. 6, ¶¶ 2(a)(v)–(ix), at 0224–25; Levine Tr. 15:4–22.)

50.     On October 1, 2020, the beginning of the Data Period, the Paycheck Advances resulted in fees based on fee schedules that varied by employer. (*See* Ex. 36.) As of today, DailyPay's Program Terms specify that when employees request Paycheck Advances they will be provided the option to (i) receive a Paycheck Advance the next business day for a fee of $0.00 to $1.99, depending on the fee structure of the employer, or (ii) receive a Paycheck Advance immediately for a fee of up to $3.99. (Ex. 5, § 2, at 0463; *see* Ex. 17, at 2191.)

13

Case 1:25-cv-03439-JGK     Document 1-1     Filed 04/25/25     Page 14 of 67

51.     The fees for Paycheck Advances with terms that begin immediately do not reflect the costs of real-time payments. The Clearing House's per-transaction cost for a real-time payment is $0.045. (Ex. 44.) And DailyPay's own investor materials emphasize that its "Transaction Costs" are decreasing as a result of "the shift to Real Time Payments (RTP)." (Ex. 17, at 2227.) Indeed, while the Company generated nearly $100 million more in fee revenue in its most recent fiscal year—an increase of more than 73% over the prior year—the transaction costs of the Company, which are defined as "everything directly related to settlements and security costs" such as "instant transaction" and "next-day ACH" costs, increased by less than 1%. (Ex. 17, at 2228.)

52.     DailyPay's Program Terms define an employee's requested Paycheck Advance, inclusive of fees, as "Daily Earnings." (Ex. 3, §§ 2 & 10, at 0215 & 0220.) And the funds that the Company sends to an employee is the "Amount Provided." (Ex. 3, § 2, at 0215.) For example, if an employee requests a $50 Paycheck Advance for a $2.99 fee, the Daily Earnings is $50 and the Amount Provided is the $47.01 ($50, less the $2.99 fee) that DailyPay sends.

53.     When an employee requests a Paycheck Advance from DailyPay, she assigns "all right, title, and interest in and to the related Daily Earnings"—in effect, an assignment of an amount equal to the sum of the Paycheck Advance and fee—to DailyPay. (Ex. 3, § 2, at 0215.) As the Company explains its business to investors: "DailyPay acquires [a] wage receivable from the employee against the payment of a fixed fee." (Ex. 17, at 2192; Levine Tr. 190:24–91:11.)

54.     The median DailyPay transaction for New York employees during the Data Period was a $77.07 Paycheck Advance that incurred a $2.99 fee. (Hasanov Aff. ¶ 25.) Across the entire Data Period, the most common Paycheck Advance was for $25 to $50 and carried a $2.99 fee, representing more than 1.1 million transactions, or nearly one in every nine. (*Id*. ¶ 28.)

55.     DailyPay's short-term, high-cost Paycheck Advance program generates substantial revenue for the Company. During the Data Period, DailyPay made more than 9.8 million Paycheck Advances to more than 130,000 New York workers. (Hasanov Aff. ¶¶ 13, 16.) DailyPay collected fees on roughly nine out of every ten Paycheck Advances (*id.* ¶ 15), for total fee revenue in excess of $27 million (*id.* ¶ 13), all collected from the wages of New York workers.

56.     DailyPay is rapidly growing: Less than 11,000 New York workers obtained Paycheck Advances in the first six months of the Data Period, while more than 50,000 obtained Paycheck Advances in later periods. (Hasanov Aff. ¶ 17.) And in the first eighteen months of the Data Period, DailyPay collected less than $3.4 million in fees, while in the last nine months alone the Company collected more than $9 million in fees. (*Id.* ¶ 14.)

57.     Beyond New York, in January of last year DailyPay told prospective investors in its most recent fundraising round that the Company had reached annual recurring revenues of more than $235 million, with more than 1.2 million active users (Ex. 17, at 2184.) DailyPay also represented that it projects an additional $1 million of revenue is added to the Company's bottom line for every 20,000 additional onboarded eligible workers. (Ex. 17, at 2184–2186.)

58.     DailyPay's Paycheck Advance program imposes an extraordinarily high cost of credit on New York workers. The median transaction described above has a median term—the number of days between which the employee received a Paycheck Advance was received and the employer sent the next paycheck to DailyPay—of 8 days. (Hasanov Aff. ¶ 25.) For such a transaction, the $2.99 fee that is paid by an employee to obtain a roughly $75 median Paycheck Advances reflects an annualized percentage rate, or APR, in excess of 193%. (*Id.*)

15

59. DailyPay's most-common Paycheck Advance is for $20, its most-common fee is $2.99, and the single most-common term is 7 days. (Hasanov Aff. ¶ 26.) Employees pay a cost of credit of more than 750% APR on Paycheck Advances with such terms. (*Id*. ¶ 26.)

60. Over the entire Data Period, New York workers paid a median APR of 193.47% and an average APR of 398.59% on Paycheck Advances that they obtained from DailyPay. (Hasanov Aff. ¶ 27.) More than 1,100,000 Paycheck Advances were for between $25 and $50 and for fees of $2.99 or $3.49, and the median APR paid by employees on these short-term loans was above 400%. (*Id*. ¶ 28.) And across all Paycheck Advances on which fees were assessed during the Data Period, roughly 93% had APRs greater than 50%, as illustrated below:



(*Id*. ¶ 29 & Ex. B.) As the chart reflects, more fee-based Paycheck Advances had APRs above 1,000% than below 50%. (*Id*. Ex. B.) Workers, meanwhile, paid APRs in excess of 500% on nearly one out of every five Payday Advances made during the Data Pariod. (*Id*. ¶ 30.)

61. An overwhelming majority of Paycheck Advances made by DailyPay during the period exceed key New York limitations. In particular, 8,700,148 Paycheck Advances had APRs

16

Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 17 of 67

above 16%, constituting nearly 99.5% of all fee-based Paycheck Advances and resulting in

DailyPay's collection of $24,366,911.52 in fees. (Hasanov Aff. ¶ 31.)

62.     Similarly, more than 99.3% of fee-based Paycheck Advances had APRs in excess

of 18%, imposing $24,327,908.32 in fees. (Hasanov Aff. ¶ 32.)

63.     Finally, more than 99.3% of all fee-based Paycheck Advances had APRs in excess

of 25%, from which DailyPay collected $24,089,752.42 in fees. (Hasanov Aff. ¶ 33.)

### III.    DailyPay Ensures that It Will Obtain Repayment of its Paycheck Advances using a Specified Flow of Funds, its User Agreements, and its Assessments of Credit Risk

64.     Despite the extraordinarily high cost of credit imposed by its short-term lending

program, DailyPay collects on virtually all amounts it is owed.

65.     For one, using real-time access to payroll data, DailyPay unilaterally determines

the maximum Paycheck Advance that an employee may obtain (Ex. 3, §§ 2 & 3 at 0215–16),

thereby ensuring that the Paycheck Advances and fees owed will be less than the paycheck

DailyPay receives. The Company employs a real-time algorithm to dynamically adjust for factors

that could affect its ability to collect on its Paycheck Advances, such as "the impacts of any taxes,

benefits, and garnishments for each unique employee." (Ex. 17, at 2203–05.)

66.     Further, if inaccurate payroll data causes DailyPay to make Paycheck Advances in

excess of an employee's actual pay amount received when pay day arrives, employers must

reimburse DailyPay for any shortfall. (Ex. 6, ¶2(a)(ix), at 0224–25.)

67.     DailyPay also obtains legal protections for amounts it is owed. When an employee

obtains a Paycheck Advance and assigns to DailyPay her wages in an amount equal to the

Paycheck Advance plus fee, she simultaneously agrees that DailyPay "can stand in [her] shoes and

receive payment for the Daily Earnings" from her employer. (Ex. 3, § 2, at 0215.) DailyPay calls

this right to receive the employee's assigned wages "non-recourse" but that remains true only if

17

the employee has not breached the Program Terms (Ex. 3, § 2, at 0215), such as by failing to make payments to DailyPay in the event an employer routes pay to the employee.

68.     When enrolling in DailyPay's program, an employee is obligated to arrange for her employer to direct deposit her pay to a DailyPay bank account. (Ex. 3, § 2, at 0215.) When taking an advance, the worker agrees that she "will not take any action" such as "redirecting payments" that has an "adverse effect on [DailyPay's] ability to collect." (Ex. 3, § 4, at 0215.)

69.     Employers also separately agree in their MSAs to make all payroll payments owed to employees who use the Paycheck Advance program directly to DailyPay. (Ex. 6, ¶ 2(a)(x), at 0225.) Thus, on payday, employers deposit workers' entire pay in a DailyPay bank account. (Ex. 31.) DailyPay then collects all Paycheck Advances and fees that it is owed from workers' paychecks before passing any remaining amounts to them. (Ex. 3, § 2, at 0215.)

70.     Because DailyPay collects all amounts it lends and fees from employers directly rather than from workers, the credit risk that the Company faces is, in its own words, "the risk that employers don't make payroll." (Ex. 17, at 2197.) As the Company tells investors: "DailyPay does not take consumer credit risk but is instead underwriting the employer." (Ex. 17, at 2191.)

71.     To guard against the credit risk that employers don't make payroll, DailyPay maintains a Credit Review Policy that requires a thorough assessment of prospective and current employers' creditworthiness. (Ex. 13; *see* Levine Tr. 82:9–15 ("The credit review is to evaluate the risk involved in . . . contracting with the employer, and effectively that the employer is going to make payroll."); *id*. at 92:22–93:2 ("Q. And ultimately what the credit review committee is assessing is, I think, as you put it earlier, the risk that the employer won't be able to make payroll? A. That's the -- would be the biggest risk.").) As part of this underwriting, employers that are not

public companies must provide to DailyPay on an ongoing basis annual audited financial information and quarterly unaudited financial information. (Ex. 6, ¶ 2(a)(xix), at 0226.)

72. When underwriting a potential employer, DailyPay first determines the number of employees who will be eligible for the Paycheck Advance program. (Ex. 13, at 0484; Levine Tr. 88:5–16.) New employers with more than 3,000 eligible employees are subjected to a full review, while all other new employers go through a "low touch" process. (Ex. 13, at 0484.)

73. For potential new employers subject to its low touch process, DailyPay reviews two data analytics metrics from Dun & Bradstreet ("D&B"): Viability Score and Failure Score. (Ex. 13, at 0484.) D&B is a professional services firm that conducts data analytics and modeling on businesses and produces and sells reports of the results of its work. (Ex. 41.)

74. D&B's Viability Score "is a multi-dimensional rating that delivers a comprehensive assessment of a company's . . . viability," including predicting "the likelihood that a company will go out of business, become inactive, or file for bankruptcy over the next 12 months." (Ex. 43.)

75. D&B's Failure Score, according to its public descriptions, "predicts the likelihood that a business will, in the next 12 months, seek legal relief from its creditors or cease business operations without paying all its creditors in full." (Ex. 42.)

76. DailyPay accepts new employers through its low touch process where employers score moderate or better on both D&B's Viability Score and its Failure Score. (Ex. 13, at 0484.) If a new employer does not meet these thresholds, they are subject to a full review under the Credit Review Policy, as are all potential new employers of greater size. (Ex. 13, at 0484.)

77. DailyPay's full review of potential new employers involves a committee process. DailyPay's Senior Committee, comprised of its Vice President of Capital Markets, its Chief Financial Officer, its Chief Operating Officer, and its Vise President of Finance, reviews all

19

Case 1:25-cv-03439-JGK     Document 1-1     Filed 04/25/25     Page 20 of 67

potential new employers with more than 5,000 potentially eligible employees, while its Junior Committee, comprised of its Director of Capital Markets, Senior Director of Capital Markets, and Controller, reviews smaller potential new employers. (Ex. 13, at 0485.)

78.     Under its Credit Review Policy, DailyPay's credit committees determine whether to accept new employers based on a review of the employers' external credit ratings, liquidity, profitability, cash flows, leverage, and other commercial factors, such as reputation, press coverage, and management team. (Ex. 13, at 0484.) The committees also have the option to offer "credit enhancements" for potential new employers. (Ex. 13, at 0485.)

79.     DailyPay's credit review onboarding is also responsive to market conditions. For example, during the first 15 months of the Covid-19 pandemic, the credit committees determined that affected employers in sectors such as travel, amusement parks, and hospitality, would undergo a full review rather than a low touch review regardless of size. (Ex. 13, at 0486.)

80.     After a new employer to the Paycheck Advance program "is credit approved and onboarded, DailyPay utilizes an ongoing credit monitoring process to account for potential changes in the credit quality of the [employer] over time." (Ex. 13, at 0487.)

81.     For employers approved after a full review, a DailyPay employee is required to contact the employer annually to obtain updated credit metrics and financial information and then prepare a report for the credit committees. (Ex. 13, at 0488–89.)

82.     The committees then determine whether to re-approve the employer, re-approve the employer with required "credit enhancements," such as quarterly rather than annual reviews, letters of credit, or personal guarantees, or deny the employer entirely. (Ex. 13, at 0489.) For employers approved after the low touch process, DailyPay re-runs the low touch process each year to ensure that the employers continue to score above the required thresholds. (Ex. 13, at 0489.)

Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 21 of 67

83.    Finally, if DailyPay determines that an employer is subject to "a deteriorating credit profile" outside the annual review process, the Credit Review Policy provides that its credit committee can take corrective actions, including reducing the size of Paycheck Advances available to employees or suspending Paycheck Advances altogether. (Ex. 13, at 0491; *see also* Levine Tr. 103:24–04:6 ("It could be the company is deemed such a credit risk that the service has to be suspended . . . the credit committee could recommend that.").)

84.    If, notwithstanding these credit risk assessments, employers fail to fund payroll in a manner that prevents DailyPay from collecting amounts it lends and fees, the result is a "Negative Balance." (Ex. 6, at Ex. A, ¶ 1(p), at 0236.) Under the MSAs, employers must reimburse to DailyPay any Negative Balance below $10,000 within thirty days and any Negative Balance above $10,000 within two days. (Ex. 6, ¶ 2(a)(xvii), at 0225–26.) Failure to make these contractual payments can result in legal action taken by DailyPay. (Ex. 6, ¶ 10(b), at 0231.)

85.    Beyond its rights vis-à-vis employers, DailyPay's Program Terms impose obligations on employees to ensure its collection of all Paycheck Advances and fees.

86.    For one, employees promise to "take all actions, including the execution of documents requested by [DailyPay], to preserve and protect [its] right, title, and interest to any Daily Earnings." (Ex. 3, § 4, at 0217; Ex. 5, § 5, at 0474.)

87.    Employees also promise as part of the Company's Program Terms to "not take any action or make any omission" that has "an adverse effect on our ability to collect on or retain any Daily Earnings." (Ex. 3, § 4, at 0217; Ex. 5, § 5, at 0474–75.)

88.    Finally, employees make an affirmative representation to DailyPay, each time they seek a Paycheck Advance that they have not sold, pledged, or encumbered the amounts that they are seeking to borrow. (Ex. 3, § 5, at 0218; Ex. 5, § 6, at 0475.)

21

89.     DailyPay also has the ability to collect directly from employees, despite its promise of non-recourse. For example, if an employer pays an employee directly rather than sending the pay to DailyPay, the employee is obligated to immediately notify DailyPay and "hold the amount in trust for our benefit." (Ex. 3, § 4, at 0217; Ex. 5, § 5, at 0474.) Failure by an employee to adhere to these obligations triggered DailyPay's rights under the Program Terms as follows:

90.     Until May 1, 2023, DailyPay was authorized to debit an employee's bank account to obtain repayment of the Paycheck Advances and fees. (Ex. 3, § 4, at 0217.) And if there is any dispute between an employee and her employer, the employee was obligated to resolve the dispute, to obtain disputed wages, and to immediately send payment to DailyPay to satisfy any outstanding Paycheck Advances; if she did not, DailyPay was authorized to debit her bank account to collect payment. (Ex. 3, § 6, at 0218–19.) The Program Terms also provided a blanket authorization to debit a bank account to address errors, fraud, and other breaches of the Program Terms. (Ex. 3, § 7, at 0219.) And the Company maintained a general right of setoff. (Ex. 3, § 9, at 0219.)

91.     DailyPay updated its Program Terms on May 1, 2023 to remove workers' debit authorizations. (*See generally* Ex. 4.) However, workers remain obligated (i) to hold amounts sent to them but owed to DailyPay in trust (Ex. 4, § 5, at 0474), (ii) to resolve disputes with employers and (iii), if unable to do so, to "immediately send [DailyPay] payment" within three days. (Ex. 4, § 7, at 0476.) Further, DailyPay retains the right to request that employees grant debit authorizations to resolve errors or fraud and, if employees decline to do so, DailyPay will settle disputed amounts against employees' next paychecks. (Ex. 4, § 8, at 0477.)

92.     The result of the substantial credit protections that DailyPay maintains is unsurprising: Across the Data Period, DailyPay successfully collected on between 99.92% and 99.99% of the Paycheck Advances made and fees assessed. (Hasanov Aff. ¶ 18.)

22

IV.    **DailyPay Traps Employees in Cycles of Dependency Resulting in Repeated Use of High-Cost Paycheck Advances Without Regard to Employees' Financial Wellbeing**

93.    To be profitable in the long run, DailyPay requires employees to obtain Paycheck Advances and pay fees to the Company both frequently and continuously over time. (*See generally* Ex. 17.) No matter how large in scale in terms of the number of employees enrolled, DailyPay cannot reliably generate profits if every employee accesses just one Paycheck Advance each month to pay for a single unexpected expense or to cover some emergency shortfall.

94.    DailyPay's product, however, provides a ready engine to drive this need for more loans: As an employee obtains a Paycheck Advance, the amount that she receives on pay day is reduced by the amount of the Paycheck Advance, plus fees. (Ex. 40). The result is that employees are more likely to need to obtain another Paycheck Advance (and pay another fee) in their next pay cycle to make up shortfalls that occurs on payday. This creates a cycle of dependency in which the act of obtaining a Paycheck Advance creates a need, in the next pay cycle, for additional funds, thereby prompting another Paycheck Advance. (*See* Ex. 37 ("Repeat usage is high and the share of workers using [Paycheck Advance] products each month is increasing.").)

95.    The result is an increasingly dependent user base. In the first six months of the Data Period, more than half of all employees averaged less than two Paycheck Advances per week. In the final nine months, more than 20,000 New York workers—more than 55% of all workers who obtained Paycheck Advances—obtained two or more each week. (Hasanov Aff. ¶ 40.)

96.    DailyPay itself acknowledges the importance of repeat use. In describing its annual revenue per-employee to investors, DailyPay finds that average per-employee use of the Paycheck Advance is two times each week. (Ex. 17, at 2192.) This average-use figure has been remarkably consistent throughout the last several years, as shown below (Ex. 17, at 2225):

23



97.    The projections DailyPay provided to investors are consistent with this reality: employees enrolled in the Paycheck Advance program have steadily increased the average number of Paycheck Advances they obtain each week from 2.07 to 2.86 (Hasanov Aff. ¶ 16 & Ex. A):



98.    Repetitive use is durable: Once a worker begins to obtain multiple Paycheck Advances each pay period, she generally continues to do so in the future. For example, when presenting future revenue for potential investors at the outset of 2024, DailyPay projected that 90% of its revenue for 2024 would come from already-enrolled or soon-to-be-enrolled employees, while

24

75% of its revenue for 2025 would come from these same employees. (Ex. 17, at 2220.) Elsewhere, DailyPay touts its ability to retain more than 96% of existing employees and revenue year over year. (Ex. 17, at 2226.) DailyPay's average revenue per employee has remained remarkably consistent throughout the last several years, as shown below (Ex. 17, at 2225):



99.     DailyPay refers to employees' pattern of durable, repetitive use of the Company's Paycheck Advance program as its "Powerful Business Model." (Ex. 17, at 2192.)

100.    Through this "Powerful Business Model" DailyPay projects that it can generate an additional $1 million in annual recurring revenue by adding 20,000 additional eligible workers (who may or may not enroll in DailyPay) as follows: *first*, about 16% of those workers will enroll and eventually become active users; *second*, those active users will eventually request two or more Paycheck Advances every week; *third*, DailyPay will generate $3 of revenue for each Paycheck Advance, or $300 annually, from each active user. (Ex. 17, at 2192.)

101.    The Company's business model is so durable, due to the dependency it creates, that DailyPay projects revenue several years out relying solely on its ability to collect about $370 on average for each active user over the next several years. (Ex. 17, at 2223–24.)

102.    The aggregate statistics DailyPay uses for its projections hide a far direr economic stress. Roughly half of employees who enroll in the Paycheck Advance program fall prey to this

pernicious cycle of use. (Hasanov Aff. ¶¶ 39–41.) DailyPay's profitability and business model are centered on these employees who obtain Paycheck Advances more than twice a week—or much more often—whom the Company refers to as its "long-term upside." (Ex. 17, at 2216.)

103.    During the Data Period, 75 to 80 percent of the Company's revenue was extracted from workers who obtained Paycheck Advances at least twice per week. (Hasanov Aff. ¶ 42.)

104.    The burden of these fees falls more heavily on employees who use the program to obtain Paycheck Advances every other day, or more, on average. These users have steadily grown from one in every six workers to more than one in every four (Hasanov Aff. ¶ 45) who incur hundreds in fees annually and paid nearly half of all fees in recent periods (*id*. ¶ 46 & Ex. E):



Because dependent employees who obtain Paycheck Advances every other day or more frequently end up obtaining Paycheck Advances shortly before payday, their cost of credit is higher than for all workers using DailyPay, jumping above a median APR of 225%. (*Id*. ¶ 43.)

105.    As the number of dependent workers has grown, so too has the number of Paycheck Advances obtained within a few days of the last one. Across the Data Period, about 75% of all

Paycheck Advances are taken out within four days of a worker's last one, while nearly three in every five Paycheck Advances are obtained by workers whose prior loan was taken out within two days or less. (Hasanov Aff. ¶ 48.) This repeat use is costly: the median APR employees pay on subsequent Paycheck Advances range from 219.15% to more than 450%. (*Id*. ¶ 49.)

106.    The effect on financial wellbeing is predictably harmful. A full-time, $15-per-hour worker can be projected to receive about $1,000 on payday. But if she obtains a median-level Paycheck Advance twice weekly—$75 for a $2.99 fee—then by pay day she will receive less than $700, leaving her hundreds of dollars short when managing large-dollar recurring expenses such as the mortgage or rent and car payment. And a highly dependent worker obtaining Paycheck Advances every other day can easily see her previous $1,000 paycheck cut in half.

107.    Similarly, the costs imposed by the DailyPay program are disproportionate to any benefit received. A worker who takes one $77.99 Paycheck Advance for a $2.99 fee receives $75 immediately and then receives $77.99 less on pay day. During the next pay cycle, the worker requests a $80.98 Paycheck Advance to make up for that lost $77.99. But this new Paycheck Advance is not providing new funds—it is filling a hole left by the prior Paycheck Advance. And the fee incurred for this and each subsequent Paycheck Advance, which can amount to $100 or more, is solely attributable to the one-time benefit received from the first Paycheck Advance.

108.    The financial behavior DailyPay's lending model encourages is unsustainable. For the ten percent of users with the highest average frequency of Paycheck Advances during the Data Period, the median size of their Paycheck Advances was $50, the median fee of their Paycheck Advances was $2.99, and the median term was 9 days. (Hasanov Aff. ¶ 44.) Through this financial activity, these workers are effectively taking out a new, 240% APR loan 5.7 times each week (*id*), with DailyPay extracting hundreds of dollars in wages from such workers annually.

27

109.    Yet while these cycles of dependency have the potential to wreak financial havoc on individual employees' lives, DailyPay has structured its business model to make the Company utterly indifferent to any such negative outcomes. (*See* Ex. 17, at 2191 ("DailyPay does not take consumer credit risk").) Instead, DailyPay contractually guarantees its own repayment through its MSAs with employers that obligate those employers to send the paychecks of financially distressed employees directly to DailyPay, ensuring that the Company is able to collect the amounts it lends and all fees first (Ex. 6, ¶ 2(a)(x), at 0225), in priority over workers' needs.

110.    Through balance updates, DailyPay encourages repeat use. In particular, whenever an employer updates its payroll records to reflect additional hours worked, DailyPay sends notice that a worker has "new earnings in your Daily Pay account!" and provides up-to-date available balance data. (Ex. 10.) For example, employees receive push notifications on their phone:



(Ex. 8.) The result is a repeated prompt to trigger frequent use:



Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 29 of 67

(Ex. 9.) Rather than discouraging frequent use (and fees), DailyPay encourages harmful behavior, telling employees they "deserve to be paid every day." (Ex. 8.) And DailyPay ads derisively chide those who are still "waiting 2 WEEKS for their paycheck???" (Ex. 22.)

111.   As a result, DailyPay is steadily growing its number of workers who are dependent on Paycheck Advances. As shown below, both the absolute number of workers who obtain Paycheck Advances more than every-other-day, and the percentage of such workers that make up all enrolled employees, has been and is steadily growing (Hasanov Aff. ¶ 45 & Exs. C, D):





Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 30 of 67

112.    Similarly, the number of Paycheck Advances that workers obtained within days of their last loans is steadily growing, with Paycheck Advances that workers obtain within two days of their last ones now generating two-thirds of all fees for DailyPay (Hasanov Aff. ¶ 50 & Ex. F):



## FIRST CAUSE OF ACTION
### Executive Law § 63(12) (Illegality)
### (N.Y. P.P.L. § 46-F – Wage Assignment)

113.    New York's Executive Law § 63(12) authorizes the OAG to seek injunctive and other relief when any individual or entity engages in repeated and persistent illegal conduct in the carrying on, conducting, or transacting of business in the state of New York.

114.    New York's Personal Property Law § 46-F prohibits any entity from directly or indirectly receiving or accepting, for the making of any advance of money for earnings assigned, a sum greater than eighteen percent annually, whether as a bonus, interest, or otherwise.

115.    As set forth in the preceding paragraphs, DailyPay has engaged in repeated and persistent illegality through its making of Paycheck Advances and directly or indirectly accepting and receiving payment in excess of eighteen percent annually for earnings assigned.

116.    By reason of the conduct set forth herein, DailyPay has engaged in repeated and persistent illegality in violation of Executive Law § 63(12).

### SECOND CAUSE OF ACTION
#### Executive Law § 63(12) (Illegality)
#### (N.Y. G.O.L. § 5-501 – Civil Usury)

117.    New York's Executive Law § 63(12) authorizes the OAG to seek injunctive and other relief when any individual or entity engages in repeated and persistent illegal conduct in the carrying on, conducting, or transacting of business in the state of New York.

118.    New York's General Obligations Law § 5-501 prohibits any entity from directly or indirectly charging, taking, or receiving any money as interest on a loan at a rate exceeding sixteen percent annually, as determined by New York's Banking Law § 14-A.

119.    As set forth in the preceding paragraphs, DailyPay has engaged in repeated and persistent illegality through its making of Paycheck Advances and directly or indirectly charging, taking, and receiving interest in amounts that exceed sixteen percent annually.

120.    By reason of the conduct set forth herein, DailyPay has engaged in repeated and persistent illegality in violation of Executive Law § 63(12).

### THIRD CAUSE OF ACTION
#### Executive Law § 63(12) (Illegality)
#### (N.Y. Penal Law § 190.40 – Criminal Usury)

121.    New York's Executive Law § 63(12) authorizes the OAG to seek injunctive and other relief when any individual or entity engages in repeated and persistent illegal conduct in the carrying on, conducting, or transacting of business in the state of New York.

122.    New York's Penal Law § 190.40 makes it a Class E felony for any entity to take or receiving money as interest on a loan at a rate exceeding twenty-five percent annually.

31

123.   As set forth in the preceding paragraphs, DailyPay has engaged in repeated and persistent illegality through its making of Paycheck Advances and directly or indirectly charging, taking, and receiving interest in amounts that exceed twenty-five percent annually.

124.   By reason of the conduct set forth herein, DailyPay has engaged in repeated and persistent illegality in violation of Executive Law § 63(12).

**FOURTH CAUSE OF ACTION**
**Executive Law § 63(12) (Illegality)**
**(N.Y. G.B.L. § 350 – False Advertising)**

125.   New York's Executive Law § 63(12) authorizes the OAG to seek injunctive and other relief when any individual or entity engages in repeated and persistent illegal conduct in the carrying on, conducting, or transacting of business in the state of New York.

126.   New York's GBL § 350 prohibits false advertising in the conduct of any business, trade, or commerce, or furnishing of any service, in the state of New York.

127.   As set forth in the preceding paragraphs, DailyPay has engaged in repeated and persistent illegality through false advertising of "no interest" or "interest free" Paycheck Advances when DailyPay assessed and collected usurious interest on the Paycheck Advances. The false advertisements were likely to mislead a reasonable consumer, in violation of GBL § 350.

128.   By reason of the conduct set forth herein, DailyPay has engaged in repeated and persistent illegality in violation of Executive Law § 63(12).

**FIFTH CAUSE OF ACTION**
**Executive Law § 63(12) (Fraud)**

129.   New York's Executive Law § 63(12) authorizes the OAG to seek injunctive and other relief when any individual or entity engages in repeated and persistent fraudulent conduct in the carrying on, conducting, or transacting of business in the state of New York.

32

Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 33 of 67

130.   Executive Law § 63(12) broadly defines fraud to include "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."

131.   As set forth in the preceding paragraphs, DailyPay has engaged in repeated and persistent fraud through its marketing and offering of Paycheck Advances in a manner that had the capacity or tendency to deceive and that created an atmosphere conducive to fraud by:

        a.      having falsely represented to employers and employees in marketing materials and that the DailyPay program was "no interest" or "interest free";

        b.      having created inaccurate impressions that consumers can obtain funds immediately through Paycheck Advances without incurring costs; and

        c.      having promoted Paycheck Advances as improving financial health and wellbeing without a factual basis and while projecting future dependency.

132.   By reason of the conduct set forth herein, DailyPay has engaged in repeated and persistent fraud in violation of Executive Law § 63(12).

### SIXTH CAUSE OF ACTION
### Executive Law § 63(12) (Illegality)
### (N.Y. G.B.L. § 349 – Deceptive Practices)

133.   New York's Executive Law § 63(12) authorizes the OAG to seek injunctive and other relief when any individual or entity engages in repeated and persistent illegal conduct in the carrying on, conducting, or transacting of business in the state of New York.

134.   New York's GBL § 349(a) prohibits deceptive acts and practices in the conduct of any business, trade, or commerce in the state of New York.

135.   As set forth in the preceding paragraphs, DailyPay has engaged in repeated and persistent illegality through deceptive marketing and offering of Paycheck Advances in a manner that was likely to mislead a reasonable consumer, in violation of GBL § 349 by:

33

Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 34 of 67

a.      having falsely represented to employers and employees in marketing materials and that the DailyPay program was "no interest" or "interest free";

b.      having created inaccurate impressions that consumers can obtain funds immediately through Paycheck Advances without incurring costs; and

c.      having promoted Paycheck Advances as improving financial health and wellbeing without a factual basis and while projecting future dependency.

136.    By reason of the conduct set forth herein, DailyPay has engaged in repeated and persistent illegality in violation of Executive Law § 63(12).

### SEVENTH CAUSE OF ACTION
### Executive Law § 63(12) (Illegality)
### (12 U.S.C. § 5531 – Deceptive Acts or Practices)

137.    New York's Executive Law § 63(12) authorizes the OAG to seek injunctive and other relief when any individual or entity engages in repeated and persistent illegal conduct in the carrying on, conducting, or transacting of business in the state of New York.

138.    The Consumer Financial Protection Act, 12 U.S.C. § 5531, prohibits a covered person from engaging in deceptive acts or practices in connection with any transaction for a consumer financial product or in the offering of a consumer financial product.

139.    DailyPay is a covered person, 12 U.S.C. § 5481(6), as DailyPay engages in the offering or providing of a consumer financial product or service.

140.    As set forth in the preceding paragraphs, DailyPay has engaged in repeated and persistent illegality through deceptive marketing and offering of Paycheck Advances in a manner that was likely to mislead a reasonable consumer, in violation of 12 U.S.C. § 5531 by:

a.      having falsely represented to employers and employees in marketing materials and that the DailyPay program was "no interest" or "interest free";

34

     b.    having created inaccurate impressions that consumers can obtain funds immediately through Paycheck Advances without incurring costs; and

     c.    having promoted Paycheck Advances as improving financial health and wellbeing without a factual basis and while projecting future dependency.

141.    By reason of the conduct set forth herein, DailyPay has engaged in repeated and persistent illegality in violation of Executive Law § 63(12).

**EIGHTH CAUSE OF ACTION**
**Executive Law § 63(12) (Illegality)**
**(12 U.S.C. § 5531 – Abusive Acts or Practices)**

142.    New York's Executive Law § 63(12) authorizes the OAG to seek injunctive and other relief when any individual or entity engages in repeated and persistent illegal conduct in the carrying on, conducting, or transacting of business in the state of New York.

143.    The Consumer Financial Protection Act, 12 U.S.C. § 5531, prohibits a covered person from engaging in abusive acts or practices in connection with any transaction for a consumer financial product or in the offering of a consumer financial product.

144.    DailyPay is a covered person, 12 U.S.C. § 5481(6), as DailyPay engages in the offering or providing of a consumer financial product or service.

145.    Employers likewise are covered persons, 12 U.S.C. §§ 5481(6)(B), (15)(A)(i), (26)(A), as they broker financial products or services and provide services to DailyPay.

146.    As set forth in the preceding paragraphs, DailyPay has engaged in repeated and persistent illegality through abusive acts and practices in connection with its offering Paycheck advances, including acts and practices that: (i) materially interfere with employees' ability to understand the terms and conditions of obtaining Paycheck Advances; (ii) take unreasonable advantage of employees' inability to protect their own interests in the selection of Paycheck

35

Advances; and (iii) take unreasonable advantage of employees' reasonable reliance on their

employers in connection with their selection and use of Paycheck Advances.

147.    By reason of the conduct set forth herein, DailyPay has engaged in repeated and

persistent illegality in violation of Executive Law § 63(12).

## PRAYER FOR RELIEF

WHEREFORE, Petitioner the People of the State of New York respectfully request that

the Court grant the Verified Petition in all respects by issuing an order and judgment:

a.    permanently enjoining Respondent from violating Executive Law § 63(12),
General Business Law ("GBL") §§ 349 and 350, General Obligations Law §
5-501, Penal Law § 190.40, Personal Property Law § 46-F, and the federal
Consumer Financial Protection Act, 12 U.S.C. § 5531 *et seq*., and from
engaging in the fraudulent, deceptive, or abusive acts or practices described
herein, including by enjoining Respondent from offering Paycheck Advances
that incur fees above the rates prescribed by New York law and requiring clear
and conspicuous disclosure of all fees in equal prominence in Respondent's
advertising of its Paycheck Advance program;

b.    ordering Respondent to provide an accounting of all consumers who paid
costs in excess of that permitted under General Obligations Law § 5-501,
Penal Law § 190.40, Personal Property Law § 46-F, in connection with
advances that were obtained from Respondent from the end of the Data Period
to the date of the Court's order and judgment;

c.    ordering Respondent to provide restitution and damages to all affected
consumers from the beginning of the Data Period to the date of the Court's
order and judgment, whether known or unknown;

36

    d.     ordering Respondent to disgorge all profits resulting from the fraudulent and

           illegal acts or practices described herein;

    e.     ordering Respondent to pay a civil penalty in the sum of $5,000 to the State

           of New York for each violation of GBL Article 22-A, G.B.L. § 350-d;

    f.     imposing appropriate civil money penalties against Respondent as authorized

           by 12 U.S.C. § 5565(c);

    g.     awarding costs under CPLR 8303(a)(6) and 12 U.S.C. § 5565(c); and

    h.     granting such other and further relief as the Court deems just and proper.

Dated:  April 14, 2025
        New York, New York

                        Respectfully submitted,

                        LETITIA JAMES
                        Attorney General of the State of New York

                        By: _____
                        Christopher L. Filburn
                        *Assistant Attorney General*
                        Bureau of Consumer Frauds & Protection
                        28 Liberty Street, 20th Floor
                        New York, New York 10005
                        Tel.: 212.416.8303
                        Email: christopher.filburn@ag.ny.gov

                        Of counsel:

                        Jane M. Azia
                        *Bureau Chief*

                        Laura J. Levine
                        *Deputy Bureau Chief*

                        *Counsel for Petitioner People*
                        *of the State of New York*

## VERIFICATION

STATE OF NEW YORK      )
                                          ):ss.:
COUNTY OF NEW YORK  )

      CHRISTOPHER L. FILBURN, being duly sworn, deposes and says:

      I am an Assistant Attorney General in the New York State Office of the Attorney General, Bureau of Consumer Frauds and Protection. I am duly authorized to make this verification.

      I have read the foregoing Verified Petition and know the contents thereof, which are to my knowledge true, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true. The grounds for my beliefs as to all matters stated upon information and belief are investigatory materials contained in the files of the Bureau of Consumer Frauds and Protection in the New York State Office of the Attorney General.

      The reason this verification is not made by Petitioner is because Petitioner is a body politic, and Letitia James, the Attorney General, is the Petitioner's duly authorized representative.

                                     _____
                                     CHRISTOPHER L. FILBURN
                                     Assistant Attorney General

Sworn to before me this
14th day of April, 2025

          KRISTIN LILIANA MANZUR
       Notary Public, State of New York
        Qualified in Richmond County
           No. 01MA6318068
   Commission Expires January 20, 2027

_____
NOTARY PUBLIC

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

PEOPLE OF THE STATE OF NEW YORK,
by LETITIA JAMES, Attorney General of the State of
New York,

Petitioner,

- against -

DAILYPAY, INC.,

Respondent.

**NOTICE OF PETITION**

Index No. _____

PLEASE TAKE NOTICE that upon the accompanying Verified Petition of Letitia James, Attorney General of the State of New York, on behalf of the People of the State of New York, the supporting Affirmation of Christopher L. Filburn dated April 14, 2025, all exhibits thereto, and the accompanying Memorandum of Law, an application will be made at the Supreme Court of the State of New York, County of New York, at 60 Centre Street, New York, NY 10007, on the 8th day of May at 9:30 a.m., or as soon thereafter as counsel can be heard, for an order and judgment under New York Executive Law § 63(12):

    a.    permanently enjoining Respondent from violating Executive Law § 63(12), General Business Law ("GBL") §§ 349 and 350, General Obligations Law § 5-501, Penal Law § 190.40, Personal Property Law § 46-F, and the federal Consumer Financial Protection Act, 12 U.S.C. § 5531 *et seq*., and from engaging in the fraudulent, deceptive, or abusive acts or practices described herein, including by enjoining Respondent from offering advances that incur fees above the rates prescribed by New York law and requiring clear and

1 of 3

conspicuous disclosure of all fees in equal prominence in Respondent's advertising of its advance program;

b.    ordering Respondent to provide an accounting of all consumers who paid costs in excess of that permitted under General Obligations Law § 5-501, Penal Law § 190.40, Personal Property Law § 46-F, in connection with advances obtained from Respondent from the end of the Data Period, as defined in the Verified Petition, to the date of the Court's order and judgment;

c.    ordering Respondent to provide restitution and damages to all affected consumers from the beginning of the Data Period to the date of the Court's order and judgment, whether known or unknown;

d.    ordering Respondent to disgorge all profits resulting from the fraudulent and illegal acts or practices described in the Verified Petition;

e.    ordering Respondent to pay a civil penalty in the sum of $5,000 to the State of New York for each violation of GBL Article 22-A, G.B.L. § 350-d;

f.    imposing appropriate civil money penalties against Respondent as authorized by 12 U.S.C. § 5565(c);

g.    awarding costs under CPLR 8303(a)(6) and 12 U.S.C. § 5565(c); and

h.    granting such other and further relief as the Court deems just and proper.

PLEASE TAKE FURTHER NOTICE that, pursuant to CPLR 403(b), answering and supporting papers in opposition to the application, if any, shall be served upon the undersigned no later than seven (7) days prior to the return date of the Verified Petition.

Dated: April 14, 2025

LETITIA JAMES
Attorney General of the State of New York


By: _____
Christopher L. Filburn
*Assistant Attorney General*
Bureau of Consumer Frauds & Protection
28 Liberty Street, 20th Floor
New York, New York 10005
Tel.: 212.416.8303
Email: christopher.filburn@ag.ny.gov


Of counsel:

Jane M. Azia
*Bureau Chief*

Laura J. Levine
*Deputy Bureau Chief*

3

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

PEOPLE OF THE STATE OF NEW YORK,
by LETITIA JAMES, Attorney General of the State of
New York,

                    Petitioner,                          Index No. _____

          - against -

DAILYPAY, INC.,

                    Respondent.

---

**AFFIRMATION OF CHRISTOPHER L. FILBURN**
**IN SUPPORT OF THE VERIFIED PETITION**

CHRISTOPHER L. FILBURN, an attorney duly admitted to practice before the courts of

the State of New York, affirms the following under penalty of perjury:

1.       I am an Assistant Attorney General in the New York State Office of the Attorney

General (the "OAG"). I am assigned to the Bureau of Consumer Frauds and Protection. I submit

this Affirmation in support of the Verified Petition and the relief sought therein.

2.       I am familiar with the facts set forth in this Affirmation, which are based upon

information contained in the investigative files of the Bureau of Consumer Frauds and Protection

within the OAG and which I believe to be true and correct.

3.       During the OAG's investigation, Respondent produced to the OAG excel data files

containing transaction-level data. The data files were analyzed and findings were made by the

OAG's Research and Analytics Department, as described in the Expert Affidavit of Akram

Hasanov, a true and correct copy of which is attached as Exhibit 1. The data files are not included

with the Verified Petition, as paper copies would be voluminous and would contain personal

financial information, but are available from the OAG at the Court's request.

4.      Attached as Exhibit 2 is a true and correct copy of excerpts of the sworn testimony of Jane Levine, Respondent's corporate representative, taken before the OAG.

5.      Attached as Exhibits 3 through 5 are true and correct copies of different versions of DailyPay Program Terms produced by Respondent to the OAG as follows:

| Exhibit | Effective Date | Beginning Bates |
|---------|----------------|-----------------|
| 3 | December 16, 2020 | DP000214 |
| 4 | May 1, 2023 | DP000470 |
| 5 | November 9, 2023 | DP000462 |

6.      Attached as Exhibit 6 is a true and correct copy of a template for the DailyPay Master Services Agreement that is entered into between DailyPay, Inc. and employers, which was produced by Respondent to the OAG with beginning Bates DP000222.

7.      Attached as Exhibits 7 through 16 are true and correct copies of documents produced by Respondent to the OAG beginning with the following Bates numbers:

| Exhibit | Beginning Bates |
|---------|-----------------|
| 7 | DP000001 |
| 8 | DP000120 |
| 9 | DP000139 |
| 10 | DP000142 |
| 11 | DP000253 |
| 12 | DP000279 |
| 13 | DP000483 |
| 14 | DP001583 |
| 15 | DP001622 |
| 16 | DP001668 |

8.      Attached as Exhibit 17 is a true and correct copy of excerpts of a document produced by Respondent to the OAG beginning with Bates DP002179.

9.      Attached as Exhibits 18 through 32 are true and correct copies of advertisements produced by Respondent to the OAG beginning with the following Bates numbers:

| Exhibit | Beginning Bates |
|---------|-----------------|
| 18 | DP000108 |
| 19 | DP000109 |

2

Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 45 of 67

| 20 | DP000112 |
|----|----------|
| 21 | DP000117 |
| 22 | DP000118 |
| 23 | DP000123 |
| 24 | DP000126 |
| 25 | DP000130 |
| 26 | DP000131 |
| 27 | DP000132 |
| 28 | DP000133 |
| 29 | DP000135 |
| 30 | DP000156 |
| 31 | DP000160 |
| 32 | DP000204 |

10.     During the OAG's investigation, Respondent produced to the OAG an advertisement in graphic interchange format, or GIF, at Bates beginning DP000141. In the GIF advertisement, screenshots of DailyPay, Inc.'s app are shown in which a user obtains $100, selects the "Now" delivery option, and states that the reason was to pay a bill. The GIF advertisement does not display any fee. Screenshots of the relevant portions of the GIF advertisement are attached as Exhibits 33 to 35. The complete GIF is available from the OAG at the Court's request.

11.     During the OAG's investigation, Respondent produced to the OAG an excel data file containing then-current fee structures of employers who contracted with DailyPay, Inc. The excel file was accompanied by a slip sheet with Bates beginning DP000392. Attached as Exhibit 36 is a true and correct copy of a printout of the worksheet in that excel file. The printout was formatted for printing but is otherwise substantively unchanged from the excel file.

12.     During the OAG's investigation, Respondent produced to the OAG an excel data file containing data underlying a report titled "DailyPay Use and Outcomes" by AiteNovarica and commissioned by DailyPay, Inc. The report is among the documents produced by Respondent to the OAG and is attached as Exhibit 11, as noted above. I reviewed the data file and it contains responses from twenty-four (24) individuals with indicated states of residence of New York. The

3

data file is not included with the Verified Petition, as a paper copy would be voluminous and would contain personal identifying information, but is available from the OAG at the Court's request.

13.    On July 18, 2024, the federal Consumer Financial Protection Bureau published on its website a report titled: "Data Spotlight: Developments in the Paycheck Advance Market." As of the date of execution of this Affirmation, that report is available at https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/. Attached as Exhibit 37 is a pdf printout of that report.

14.    Attached as Exhibits 38 through 44 are true and correct copies of printouts from websites and other publicly available documents, as follows:

| Exhibit | Title | Available At | Date Accessed |
|---|---|---|---|
| 38 | DailyPay – Overview | DailyPay Website | July 26, 2024 |
| 39 | DailyPay – About Us | DailyPay Website | July 26, 2024 |
| 40 | DailyPay – EWA | DailyPay Website | July 26, 2024 |
| 41 | D&B – Analytics | D&B Website | July 25, 2024 |
| 42 | D&B – Failure Score | D&B Website | July 25, 2024 |
| 43 | D&B – Viability Score | D&B Website | July 25, 2024 |
| 44 | TCH Uniform Pricing | TCH Website | February 7, 2025 |

Dated: April 14, 2025
      New York, New York

_____
     Christopher L. Filburn
     Assistant Attorney General

4

## CERTIFICATION

CHRISTOPHER L. FILBURN, an attorney duly admitted to practice before the courts of the State of new York, affirms the following under penalty of perjury:

1.  I am an Assistant Attorney General in the New York State Office of the Attorney General. I am assigned to the Bureau of Consumer Frauds and Protection.

2.  The foregoing Affirmation complies with the word count limit set forth in Rule 202.8-b, as it contains 867 words excluding the parts exempted by the Rule, as indicated by the "Word Count" feature of Microsoft Word.

Dated: April 14, 2025
New York, New York

_____
Christopher L. Filburn
Assistant Attorney General

# EXHIBIT 1

## EXPERT AFFIDAVIT OF AKRAM HASANOV

STATE OF NEW YORK       )
                                ) ss:
COUNTY OF NEW YORK    )

AKRAM HASANOV, being duly sworn, deposes and says:

1.      I am a Data Scientist in the Research and Analytics Department in the Executive Division of the New York State Office of the Attorney General (the "OAG").

2.      As part of the OAG's investigation into the business practices of DailyPay, Inc. ("DailyPay or "the Company"), counsel in the OAG's Bureau of Consumer Frauds and Protection has asked me to analyze certain data produced by DailyPay in the investigation.

## I.    PROFESSIONAL CREDENTIALS

3.      In my position as a Senior Data Analyst I lead, assist, and support a wide variety of investigations and cases, including, but not limited to, those in the areas of consumer frauds and protection, investor protection, financial fraud, civil rights, and housing. I have been frequently called upon to conduct mathematical and statistical analyses.

4.      In 2010, I graduated with degrees in Finance from the University of Louisiana Monroe. I previously worked at the OAG from 2013 to 2015 as a Financial Research Analyst. I have also worked at a consulting firm and in a position in New York City government. I rejoined the OAG's Research & Analytics Department in February 2019.

## II.    DATA RECEIVED AND ASSIGNMENT FROM COUNSEL

5.      Counsel has explained to me that DailyPay offers "Paycheck Advances" to New York-based employees under which the Company will send requested funds to employees and collect those funds, plus fees, from employees' paychecks on the subsequent payday.

6.      In connection with the OAG's investigation of DailyPay, I have reviewed two excel files provided to the OAG containing New York transaction-level data for Paycheck Advances, DP000446 and DP000447. These files contain data for millions of Paycheck Advance transactions occurring between October 1, 2020 and December 31, 2024 (referred to herein as the "Data Period"), including columns for the following data points for each transaction: USER_ID; First Name; Last Name; Full Street Address; Phone Number; Email; PROVIDER_GROUP_ID; PAYMENT_ID; Paid On Date; Payment Receipt Date; TRANSFER_AMOUNT; FEE_AMOUNT; TRANSFER_CT; TIME_PERIOD (hereinafter, the "Transaction Data").

7.      I also have reviewed excerpts of the transcript of testimony of Jane Levine, a DailyPay representative. Based on my review, it is my understanding that certain of the above-referenced data points contain the following information about each transaction:

    a.      USER_ID: A unique identifier assigned to each DailyPay user that can be used to identify all Paycheck Advances obtained by that user;

    b.      PROVIDER_GROUP_ID: A unique identifier assigned to each employer that contracts to offer Paycheck Advances;

    c.      Paid On Date: The date on which DailyPay transfers funds to an employee that requested a Paycheck Advance;

    d.      Payment Receipt Date: The date on which DailyPay collects funds it sends to employees, plus fees, from employees' paychecks;

    e.      TRANSFER_AMOUNT: The amount of money DailyPay sends to an employee on the Paid On Date; and

    f.      FEE_AMOUNT: The amount of money DailyPay collects, along with the TRANSFER_AMOUNT, on the Payment Receipt Date.

8.      I also have reviewed an excel file provided to the OAG containing all amounts that the Company did not collect on its New York Paycheck Advances but instead wrote off during the Data Period, including columns for the following data points: USER_ID; PAYMENT_ID; Paid On; WRITE_OFF_TOTAL (hereinafter, the "Loss Data").

9.      Based on my review of excerpts of the testimony of Jane Levine, a representative of DailyPay, it is my understanding that certain of the above-referenced data points contain the following information about each transaction:

      a.    USER_ID: A unique identifier assigned to each DailyPay user that can be used to identify all Paycheck Advances obtained by that user;

      b.    Paid On: The date on which DailyPay transfers funds to an employee that requested a Paycheck Advance, equivalent to the "Paid On Date" referred to in the transaction-level data files; and

      c.    WRITE_OFF_TOTAL: The amount of money DailyPay no longer intends to collect from the employee.

10.      Based on data derived from the materials identified above, I calculated a number of aggregate, average, and median statistics, which are set forth below.

11.      I also have performed certain calculations on the data, including calculations of annualized percentage rates, or APRs, as described and set forth below.

12.      I also have identified both employees who obtain Paycheck Advances on average within certain intervals of time and transactions that occur within certain intervals of time from other transactions by the same employees, and to perform similar calculations on these subsets, all of which is described and set forth below.

## III.   AGGREGATE, AVERAGE, AND MEDIAN STATISTICS

13.      Based on the Transaction Data, during the Data Period, which is from October 1, 2020 to December 31, 2024, DailyPay made 9,860,161 Paycheck Advances. In connection with these Paycheck Advances, DailyPay sent a total of $1,082,054,584.86 to employees. DailyPay collected $27,615,814.20 in fees from these Paycheck Advances, and collected a total of $1,109,670,399.06, the sum of both amounts advanced and fees, from employees.

14.      The amount of funds advanced and fees collected by DailyPay is accelerating. For example, the Company advanced $114,829,275.59 and collected $3,352,274.34 in fees during the

Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 52 of 67

first 18 months of the Data Period. By contrast, the Company advanced $373,723,631.67 and collected $9,087,504.78 in fees during the final 9 months of the Data Period.

15.    DailyPay collected fees on more than 88.6% of its Paycheck Advances during the entire Data Period. This percentage has remained stable over time: The Company collected fees on more than 91.4% of its Paycheck Advances during the first six months and collected fees on more than 85% of its Paycheck Advances during the last nine months of the Data Period.

16.    DailyPay made a Paycheck Advance to 134,754 unique New York employees during the Data Period. The Company made an average of 2.33 Paycheck Advances per week to each employee. And the frequency of Paycheck Advances per-employee has steadily increased, from 2.07 per week during the first six months of the Data Period to 2.86 per week in the final three months, as reflected in the chart below, which is separately appended hereto as Exhibit A:



17.    DailyPay's worker base is rapidly growing. In total, 10,756 employees obtained a Paycheck Advance during the first six months of the Data Period, while 50,251 employees obtained a Paycheck Advance between April 1, 2024 and September 30, 2024.

18.     DailyPay did not collect $22,522.27 on Paycheck Advances made during the Data Period. The Loss Data does not indicate whether $22,522.27 is the Company's non-collection of amounts advanced, of fees, or of all amounts owed. If the Loss Data reflects non-collection of fees only, DailyPay collected nearly 99.92% of all fees. If the Loss Data reflects non-collection of all amounts owed, DailyPay collected more than 99.99% of all amounts owed.

## IV.     ANNUALIZED PERCENTAGE RATES

### *Calculation of APR*

19.     An interest rate is the cost paid to a lender for borrowing money. The higher the rate, the more borrowers pay over the life of a loan. CFPB, *What is the Difference between a Loan Interest Rate and the APR?* (Jan. 30, 2024), *available at* https://www.consumerfinance.gov/ask-cfpb/what-is-the-difference-between-a-loan-interest-rate-and-the-apr-en-733/.

20.     A common measure of interest is an APR, which expresses the interest rate as a percentage and reflects the cost of interest on an annualized basis. APR is calculated by dividing (i) the interest paid as a percentage of the principal lent by (ii) the number of years, or fraction of a year), over which the full amount of the loan is to be repaid.

21.     An APR calculation on a loan that incurs interest daily can be expressed as follows:

$$APR = ( I / P ) \div ( D / 365 )$$

In the above calculation, APR is calculated by dividing the total interest payment, or I, by the amount lent or principal, P, and then dividing that by the number of days in the term of the loan, D, by 365, which is the number of total days in a year.

22.     As a simple example, if a borrower receives $50 and agrees to pay back $55 five days later, the interest, or I, is $5, the principal, or P, is $50, and the number of days, or D, is 5. The APR is thus equal to (5/50) ÷ (5/365), which is 1/10 ÷ 1/73, which is 7.3 or 730% APR.

Case 1:25-cv-03439-JGK     Document 1-1     Filed 04/25/25     Page 54 of 67

23.     In my analysis of the data provided by DailyPay, I treated TRANSFER_AMOUNT as the principal, or P, and the FEE_AMOUNT as the interest, or I, when calculating APRs from the Transaction Data. I also treated the number of days, or D, as the difference between the Paid On Date and the Payment Receipt Date when calculating APRs from the Transaction Data.

24.     571 Paycheck Advances in the Transaction Data had Paid On Dates and Payment Receipt Dates that were the same, reflecting a term of less than one day. For all APR calculations herein, I treated the number of days, or D, for these Paycheck Advances as N/A. As a result, the APR statistics presented herein exclude these 571 Paycheck Advances entirely.

### *APR Calculations on the Data*

25.     In the Transaction Data, the median amount advanced is $77.07, the median fee is $2.99, and the median number of days in the term is 8. An employee pays an APR of 193.5% on a Paycheck Advance for $77.07 with a $2.99 fee to be repaid in 8 days.

26.     In the Transaction Data, the most frequent amount of a Paycheck Advance, fee, and number of days in the term is $20, $2.99, and 7, respectively. An employee pays an APR of 756.07% on a Paycheck Advance for $20 with a $2.99 fee to be repaid in 7 days.

27.     Across the entirety of the Transaction Data, the median APR employees paid is 193.47%, while the average APR employees paid is 398.59%.

28.     The most common combination of advance amount and fee in the Transaction Data is an advance between $25 and $50 and a fee of $2.99 or, for more recent periods, a fee of $3.49. More than 1.1 million Paycheck Advances fall within this bucket, representing 11.31% or one in every nine during the Data Period. It also is the first- or second-most common combination for each six-month period. The median APR on these Paycheck Advances with amounts advanced between $25 and $50 and fees of $2.99 or $3.49 was above 400%.

29.     For all Paycheck Advances in the Transaction Data for which a fee was collected, 93% of the Paycheck Advances had an APR in excess of 50%. More than 85% of all fee-based Paycheck Advances had APRs between 50% and 1000%, and the range of APRs is distributed as in the chart below, which is separately appended hereto as Exhibit B:



30.     At its highest, APRs on Paycheck Advances reached 25,477%, with employees paying APRs in excess of 500% on more than 19% of all Paycheck Advances.

31.     Across the Transaction Data for the Data Period, 8,700,148 or 88% of all Paycheck Advances, had APRs in excess of 16%. In total, employees paid $24,366,911.52 in fees on these Paycheck Advances. And for all Paycheck Advances for which a fee was collected, nearly 99.5% of such Paycheck Advances had APRs in excess of 16%.

32.     Across the Transaction Data for the Data Period, 8,686,222 or 88% of all Paycheck Advances, had APRs in excess of 18%. In total, DailyPay collected $24,327,908.32 in fees on these Paycheck Advances. And more than 99.3% of Paycheck Advances for which a fee was collected had APRs in excess of 18%.

33.     Across the Transaction Data for the Data Period, 8,601,189 or 87% of all Paycheck Advances, had APRs in excess of 25%. In total, employees paid $24,089,752.42 in fees on these Paycheck Advances. And for all Paycheck Advances for which a fee was collected, more than 99.3% of such Paycheck Advances had APRs in excess of 25%.

## V.     **PAYCHECK ADVANCE USAGE ANALYSES**

34.     To assess frequency of Paycheck Advance use, I examined both (i) how often each employee, on average, obtained a Paycheck Advance and (ii) how often an employee obtained a Paycheck Advance within a certain period of time since the last Paycheck Advanced.

35.     For the first assessment, I used USER_ID in the Transaction Data to identify the first and last date on which each employee obtained a Paycheck Advance. For employees who obtained more than 10 Paycheck Advances during the Data Period, I then calculated the number of weeks over which each employee obtained Paycheck Advances. I then counted the total number of Paycheck Advances each employee obtained to calculate a P for each employee, where P represents the average number of Paycheck Advances the employee obtained each week. For example, if there were 20 weeks between an employee's first and last Paycheck Advance and the employee obtained 30 Paycheck Advances in total, the employee's P would equal 1.5.

36.     For the second assessment, I again used USER_ID in the Transaction Data to order all Paycheck Advances obtained by each employee by date. For each employee, I then determined the set of all Paycheck Advances that were obtained within X days of a prior Paycheck Advance. For example, if an employee obtained Paycheck Advances on May 1, May 4, May 5, May 8, and May 10, and X was set to 2, then the Paycheck Advances obtained on May 5 and May 10 would be part of the set of Paycheck Advances obtained within two days of the last.

Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 57 of 67

37.     The Transaction Data reflects that a number of employees obtained more than one Paycheck Advance on the same day. In these cases, I treated the first Paycheck Advance listed in the file as an original Paycheck Advance that was not obtained within X number of days since the last (unless the Transaction Data included another Paycheck Advance that the employee obtained X or fewer days earlier), and all other Paycheck Advances on that day as part of the set.

*Analyses of Frequent Users*

38.     I evaluated both employees with Ps 2 or greater, referred to as "Biweekly Users," and employees with Ps 3.5 or greater, referred to as "Frequent Users".

39.     For the first six months of the Data Period, more than half of all employees who obtained a Paycheck Advance did not average more than two per week. And across the entire Data Period, more than 70% of employees were not Frequent Users.

40.     In more recent periods, more than half of employees are Biweekly Users. In the final nine months of the Data Period, these more than 20,000 Biweekly Users made up more than 55% of all employees who obtained Paycheck Advances from DailyPay.

41.     Employees who are not Biweekly Users or Frequent Users obtain a few Paycheck Advances, often during short periods, and then and do not continue to obtain Paycheck Advances over time. The median number of advances obtained by such employees is 13, and the number of days between such employees' first and last Paycheck Advance is 127.

42.     DailyPay's fees are concentrated among employees who become Biweekly Users or Frequent Users. Biweekly Users accounted for more than 77% of all fees collected by DailyPay in the Data Period. DailyPay's 23,348 Biweekly Users generated more than $4.5 million in fees, representing nearly 80% of fees collected by DailyPay from April 1 to September 30, 2024.

43.    The cost of credit borne by employees grows as they become Biweekly Users and then Frequent Users. Biweekly Users pay a median APR of 202.20% on their Paycheck Advances, as compared to a median APR of 193.47% paid all employees across the entire Transaction Data. And the median APR paid by Frequent Users jumps to 227.64%.

44.    Similarly, for the ten percent of DailyPay users who have the highest average frequency of Paycheck Advances, the median size of the Paycheck Advance was $50, the median fee was $2.99, and the median term was 9 days. An individual Paycheck Advance with these particular characteristics would carry an APR of more than 242.5%. And these ten percent of users obtain a new Paycheck Advance on average 5.7 times each week.

45.    DailyPay's Frequent User base steadily grew throughout the Data Period, both in absolute and relative terms. As shown in the charts below, which are separately appended hereto as Exhibits C and D, during the first six months of the Data Period, the Company had 1,255 Frequent Users, representing 16.15% of all employees, while in the final three months of the Data Period, the Company had 10,240 Frequent Users, representing 27.71% of all employees:





46.     While Frequent Users continue to make up approximately a quarter of employees who obtain Paycheck Advances, because of their frequent use they generate a large portion of the total fees that DailyPay collects. As shown in the chart below, which is separately appended hereto as Exhibit E, the percentage of DailyPay's total fee collections that are attributable to Frequent Users has steadily grown from less than a third of all fees to nearly half of all fees:



In the final nine months of the Data Period alone, DailyPay collected $4,265,820.98 in fees from its 21,252 Frequent Users, reflecting an average of $200.73 per Frequent User. This would reflect an annual average of $267.64 that DailyPay collects from each Frequent User.

### *Analyses of Repetitive Transactions*

47.     When assessing Paycheck Advances that employees obtained within a certain number of days since the employees obtained their last Paycheck Advance, I evaluated both Paycheck Advances obtained within 4 days and 2 days of the last advance.

48.     Most Paycheck Advances fall within one or both of these sets. Over the Data Period, nearly three in every four Paycheck Advances obtained by an employee was obtained within four days of that employee's last Paycheck Advance, while nearly three in every five Paycheck Advances was obtained by an employee within two days of the last advance.

49.     Because these Paycheck Advances are being obtained repeatedly within the same pay period, repeat advances are likely to have shorter terms and carry higher costs of credit. For example, the median APR for Paycheck Advances obtained by employees within two days of their last Paycheck Advance is 219.15%. And the most common advance amounts for these repeat advances are between $25 to $50, with fees, reflecting APRs in excess of 450%.

50.     As with Biweekly Users and Frequent Users, DailyPay collects the bulk of its fee revenue from repeat advances. As shown in the chart below, which is separately appended hereto as Exhibit F, the percentage of DailyPay's total fees attributable to Paycheck Advances employees obtain within four days of their last paycheck has steadily grown to more than 80% of all fees, and the percentage of DailyPay's total fees attributable to Paycheck Advances employees obtain within two days of their last has grown to more than two-thirds of all fees:



\*                    \*                    \*

51.     I affirm this 14th day of _____April_____, 2025, under the penalties of perjury under
the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and
I understand that this document may be filed in an action or proceeding in a court of law.

A. Hasanov

_____
Akram Hasanov

13

Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 62 of 67

# HASANOV
# EXHIBIT A

Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 63 of 67



Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 64 of 67

# HASANOV

# EXHIBIT B



# HASANOV

# EXHIBIT C

