Case 1:25-cv-03439-JGK    Document 1-13    Filed 04/25/25    Page 1 of 71

# EXHIBIT 40



Employers ⌄    Solutions ⌄    Our Partners ⌄    Resources ⌄    |    For Employees ⧉    🔍    Log In    Get a Demo

**EWA PLATFORM**

# An Earned Wage Access Platform Built for Today's Employees

With DailyPay you can help your employees to own the power of the day. DailyPay's earned wage access platform — also known as on-demand pay — gives your employees more control over their earned pay leading to greater financial wellness.

This increased financial control not only helps your employees in their everyday lives but also benefits your company. Greater financial wellness leads to higher employee engagement, motivation and tenure.

**Let's Talk**





7/26/24, 8:31 AM    Case 1:25-cv-03439-JGK    Document 16    Earned Wage Access Platform    Filed 04/25/25    Page 3 of 71

**Improve Financial Wellness**

**72%** of DailyPay users surveyed say that DailyPay helps them feel more confident in managing their finances.[1]

**Increase Motivation**

Nearly half **(49%)** of users surveyed say DailyPay makes them feel more motivated at work.[2]

## Improve Retention

**48%** of DailyPay users surveyed say they are more likely to stay with their current employer because they offer DailyPay.[3]

7/26/24, 8:31 AM
Case 1:25-cv-03439-JGK    Document 16    Leading Wage Access Platform    Filed 04/28/25    Page 5 of 71

[1, 2] DailyPay Employee Experience Research, Arizent study commissioned by DailyPay, September 2023; [3] DailyPay User Survey, November 2022

**DAILYPAY APP**

## The Leading Earned Wage Access Platform

### Instant Access to Earned Pay

Access up to 100% of earned pay, anytime, anywhere.

> Transfer up to 100% of earned pay, anytime, anywhere for a small flat fee. No-fee* instant transfers of earned pay to the DailyPay Visa® Prepaid Card

> No fee for 1-3 business-day transfers to any account

### Clarity into Earnings and Spending

View deposits, transfers, withdrawals, purchases and more in one app.

### Savings Tools

Send portions of pay to a savings account each pay cycle via multiple options.

### Credit Health

Improve your financial control by keeping a close eye on your credit report, helping you spot errors or fraud early and preventing costly surprises. A good credit score can lead to lower interest rates, so you can save more money.

**DAILYPAY VISA® PREPAID CARD**

## An EWA Option For Every Employee

**No-fee\* Instant Access to Earned Pay**

✓ Works anywhere Visa debit cards are accepted

✓ No-fee† withdrawals at 55,000+ in-network Allpoint® ATMs

**Track Earnings and Spending in One Place**

✓ View earnings (pre- and post-withholdings) for every reported shift

✓ See all early transfers for the pay period

✓ See all card transactions

✓ View all shifts worked for the pay period

**No Hidden Fees**

- ✓ No fee† to register
- ✓ No monthly fees
- ✓ No minimum balance requirements
- ✓ No overdraft penalties

**No Hassle**

- ✓ No additional lift for payroll teams
- ✓ Fully managed by DailyPay
- ✓ Seamless implementations

The DailyPay Card is not a credit card so there's no credit check required – just ID verification – and users don't need an existing bank account to sign up.

## The Benefits of an Earned Wage Access Platform

With an earned wage access platform employers can provide greater financial wellness support for employees, leading to happier and more productive employees across an organization.

7/26/24, 8:31 AM          Case 1:25-cv-03439-JGK    Document 16   Earned Wage Access Platform Filed 04/25/25    Page 8 of 71

### Recruit

96% of companies offering an EWA solution today believe it has a positive impact on employee recruiting.[5]

### Engage

95% of companies offering an EWA solution today believe it has a positive impact on employee engagement.[6]

### Motivate

Nearly half (49%) of users surveyed say DailyPay makes them feel more motivated at work.[7]

[5,6] Hanover Research Study: Companies with EWA Solutions, September 2023; [7] DailyPay Employee Experience Research, Arizent study commissioned by DailyPay, September 2023

## Simple Implementation With DailyPay

DailyPay's earned wage access platform seamlessly and securely integrates with payroll, HCM and timekeeping systems to avoid unnecessary, extra work for your teams. From there, we'll work with you on technical implementation and build a customized launch strategy.

**Simple implementation**

**No building or retooling**

**Get started fast**

**DAILYPAY INTEGRATIONS**

## Trusted by Industry Leaders

Our relationships with leaders in human capital management, payroll, workforce management and time management systems allow us to offer on-demand pay solutions that easily integrate with systems to record.

**View all integration partners >**

## How DailyPay Helps Retain Employees and Attract New Talent

Radiology firm Radnet wanted to give team members access to their money as soon as they needed it and solutions to improve their financial control.

7/26/24, 8:31 AM    Case 1:25-cv-03439-JGK    Document 13    Earned Wage Access Platform    Filed 04/25/25    Page 10 of 71

## See Why Top Companies Choose DailyPay

[ Let's Talk ]

### Empowering for Employees

Greater financial control with access up to 100% of their DailyPay balance to meet the challenges of unexpected financial disruptions.

Improved planning with visibility to spending and earned pay in one easy-to-use app.

No need for a pre-existing checking or savings account.

### Simple and Secure for Employers

Minimal change to payroll processes — DailyPay handles it all.

Seamless integration with HCM, payroll, banking and benefit applications.

Enterprise-grade platform that keeps data private and the service running so it's always there when your employees need it.



**TRUSTED BY LEADING COMPANIES**

Company ⌄

Employers ⌄

Resources ⌄

**For Employees**



visit get.dailypay.com

**Follow us**

     

**Get Friday**

 

**Get DailyPay**

 

**DailyPay HQ**

55 Water Street New York, NY 10041

**Contact us ›**

⁺ Requires employer participation in DailyPay, and election to deposit early transfers and set direct deposit to the Friday Card.

⁺⁺ Other fees and limits apply. See Cardholder Agreement for details.

* Employer must include tips in employee earnings

The Friday by DailyPay Visa® Prepaid Card is issued by The Bancorp Bank, N.A., Member FDIC, pursuant to a license from Visa U.S.A. Inc. and can be used everywhere Visa debit cards are accepted.

DailyPay is a proud member of the
On-Demand Pay International Council.
**Learn More**

© DailyPay    Privacy    Accessibility    Terms of Service    OSS Attribution    Program Terms    Status

Case 1:25-cv-03439-JGK    Document 1-13    Filed 04/25/25    Page 12 of 71

# EXHIBIT 41

7/25/24, 11:06 AM    Case 1:25-cv-03439-JGK    Dounuments 1.25 stree Fillyti 0425/25 Business    Page 13 of 71



## Our Analytics

Delivering deep insights about your most valuable relationships by applying machine learning, AI, industry experience, and understanding to your data and ours.

Enterprise Analytics        Predictors, Scores & Ratings        Contact Data Transparency

HOME    >    ABOUT D&B    >    OUR ANALYTICS

    

## Dun & Bradstreet Analytics Transparency Statement

Dun & Bradstreet's Models, Ratings, Scores and Predictors ("Analytics") are derived from data elements comprising a collection of firmographic data sets, which include data about basic business attributes (e.g., industry, business size and business age), and contributed data sets (e.g., trade payment data), as well as the historical performance of such data sets.

Not all data elements of basic or contributed data sets are available to us for all businesses. In instances where data elements are not available, Analytics for such businesses may be estimated based on benchmark data derived from appropriate peer groups associated with basic business attributes that are substituted for the absent data elements. The replacement data, which is an estimate, may not result in the calculation of the same Analytics that would be calculated for a business if a business's actual data elements were available and used instead.

Dun & Bradstreet obtains data from external sources it believes to be accurate and reliable, but Dun & Bradstreet is not an auditor and undertakes no duty of due diligence or independent verification of any information it receives. Because of the possibility of human or mechanical error, the data provided to Dun & Bradstreet may include inaccuracies or errors, which may in turn affect the performance of certain Analytics.

In some cases, you may be able to supplement the data about your business in our data sets. If you are a principal of a private organization based in the US and would like to view the basic information we have on your business, you may do so using our free solution, D-U-N-S Manager. Using D-U-N-S Manager, you can submit updates or dispute information, subject to review, validation and potential acceptance by Dun & Bradstreet at https://www.dnb.com/duns-number.html. Alternatively, you may contact our Customer Service team at http://service.dnb.com and select the Contact Customer Service button to submit updates or dispute information, subject to review, validation and potential acceptance by Dun & Bradstreet.

Our Analytics are statements of opinion as of the date they are expressed and are not statements of current or historical fact or recommendations about any businesses. Dun & Bradstreet assumes no obligation to update our Analytics following publication in any form or format.

Case 1:25-cv-03439-JGK    Document 1-13    Filed 04/25/25    Page 14 of 71

Every business decision, to some degree, represents an assumption of risk. Our Analytics are predictions, but Dun & Bradstreet cannot guarantee the performance of such Analytics for each individual business. Further, Dun & Bradstreet Analytics do not take into account every risk that might affect a business or your specific business, including but not limited to other economic factors or changing market conditions. Our Analytics should not be relied on and are not a substitute for the skill, judgment and experience of the user of our Analytics, its management, employees, advisors and/or clients when making business decisions. Finally, past performance does not guarantee or indicate future results.

Further, our Analytics do not take into account the individual circumstances of each user of our Analytics. Therefore, each user should evaluate and use our Analytics based on individual circumstances and specific credit analysis needs. Nothing in any of our Analytics is an endorsement or a determination of a business's qualification for a loan, or any other extension of credit. Dun & Bradstreet does not represent that its Analytics are identical or similar to any other credit score or score model.

Our Analytics are provided on an "as is" basis. **DUN & BRADSTREET DISCLAIMS ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE. IN NO EVENT SHALL DUN & BRADSTREET BE LIABLE TO ANY PARTY FOR ANY DIRECT, INDIRECT, INCIDENTAL, EXEMPLARY, COMPENSATORY, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES, COSTS, EXPENSES, LEGAL FEES, OR LOSSES (INCLUDING, WITHOUT LIMITATION, LOST INCOME OR LOST PROFITS AND OPPORTUNITY COSTS OR LOSSES CAUSED BY NEGLIGENCE) IN CONNECTION WITH ANY USE OF THE ANALYTICS EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.** Some jurisdictions do not allow the limitation of liability, so the foregoing limitation may not apply to you. In such states, countries, or jurisdictions, the liability of Dun & Bradstreet shall be limited to the fullest extent permitted by law.

## Our Analytics

When businesses around the world want to understand their most important relationships, they turn to Dun & Bradstreet as a trusted source – and they have for 175 years.

With rich proprietary data assets and a world-class team, we illuminate the path to growth with unique, global Analytics capabilities. We help companies enhance and scale their use of fact-based strategies to connect with the prospects, customers, and suppliers that matter the most to them.

90% of the Fortune 500™ and companies of all sizes worldwide rely on D&B for the data, analytics and advanced expertise to create competitive, winning business strategies.

Dun & Bradstreet's data scientists, analysts and PhDs average more than a decade of experience in analytics modeling, strategy and implementation. With deep presence in the U.S., Europe and Asia, this global team works across different data, method and software types to set a high bar on innovation and research and development. They're dedicated to working with Analytic Modeling teams at many of the world's leading companies across critical industries – Financial Services, Insurance, High Tech, Telecom, Manufacturing, and others – to uncover meaning in data.

Specializing in commercial, consumer and industry-specific information, we apply the latest statistical methodologies, such as: scorecard build, regression, decision trees, machine learning and text analytics. Adding this to deep understanding the most current statistical software -- SAS, SPSS, R, and Python – gives us the unique ability to build the highest performing predictors, ratings, scores and advanced analytic models.

**Our data informs our analytics and our analytics inform our data**

Analytics begin and end with asking the right questions – and having the right data. If the data is wrong, the model won't perform. That's why each analytic engagement begins with a thorough understanding of the business problems we want to solve for you. Then we go to work to bring the right combination of data sources – yours and ours – into the equation. Think about how much richer your insights are when you augment your own data with information and transactions that have happened outside your view of your customers – but within our view as the caretakers of the world's most comprehensive collection of business data and analytical insights. We bring all this insight together to answer your most challenging business questions.



7/25/24, 11:06 AM    Case 1:25-cv-03439-JGK    Document 1-3    Filed 04/25/25    Page 15 of 71
About Dun & Bradstreet | Business Directory

INDEX NO. 154851/2025
Case 1:25-cv-03439-JGK    Document 1-13    Filed 04/25/25    Page 16 of 71
RECEIVED NYSCEF: 04/14/2025

# EXHIBIT 42

7/25/24, 11:01 AM    Case 1:25-cv-03439-JGK    Document 13    Filed 04/25/25    Dun & Bradstreet Failure Score    Page 17 of 71



HOME    >    RESOURCES    >    BUSINESS CREDIT    >    BUSINESS CREDIT SCORES AND RATINGS    >    D&B FAILURE SCORE

## What Is the Failure Score?

The D&B Failure Score (formerly the Financial Stress Score) predicts the likelihood that a business will, in the next 12 months, seek legal relief from its creditors or cease business operations without paying all its creditors in full. The Failure Score is derived from the information in the Dun & Bradstreet Data Cloud.

## What Does the D&B Failure Score Look Like?

The Failure Score is a multidimensional score comprising three components: a percentile of 1 to 100, a class of 1 to 5, and the score itself, which ranges from 1,001 to 1,875, with the lowest score representing the highest level of risk that a business will fail in the next 12 months.

### D&B® FAILURE SCORE

The D&B Failure Score predicts the likelihood that a business
will experience financial stress in the next 12 months.

#### D&B FAILURE SCORE AT-A-GLANCE

| Failure Raw Score | Failure Percentile | Failure Class | Incidence of Failure |
|---|---|---|---|
| 1570–1875 | 95–100 | 1 | 0.03% |
| 1510–1569 | 69–94 | 2 | 0.09% |
| 1450–1509 | 34–68 | 3 | 0.24% |
| 1340–1449 | 2–33 | 4 | 0.84% |
| 1001–1339 | 1 | 5 | 4.70% |

#### CLASS DISTRIBUTION

| 6% | 26% | 35% | 32% | 1% |
|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 |

"0" denotes open bankruptcy or higher risk situations.

Like the D&B® Delinquency Predictor Score, the risk information is classified in three ways, from the broadest (the class) to the most specific (the score.) The classifications are:

1. A **score** between 1,001 and 1,875, where 1,001 represents businesses that have the highest probability of failure and 1,875 represents businesses with the lowest probability. This score provides a direct relationship between the score and the level of risk and enables the more granular cutoffs typically used in automated decisioning.

2. A **percentile** between 1 and 100, where 1 represents businesses that have the highest probability of failure and 100 represents businesses with the lowest probability. The percentile shows where a company falls among businesses in the Dun & Bradstreet Data Cloud and is most effectively used to rank a portfolio from highest to lowest risk of business failure.

3. A **class** between 1 and 5, which segments the scoreable universe into five distinct risk groups, with 1 representing businesses that have the lowest probability of failure and 5 representing businesses with the highest probability. The class helps you to quickly segment new and existing accounts into risk groupings to determine appropriate credit policies.

7/25/24, 11:01 AM
Dun & Bradstreet Failure Score
Case 1:25-cv-03439-JGK    Document 15    Filed 04/25/25    Page 18 of 71

## How Is the D&B Failure Score Calculated?

Dun & Bradstreet aggregates company information from a variety of sources. These include public records, financial statements, and past payment experiences. The Failure Score also weighs a company's demographics against those of similar firms in the same industry. Some data elements used to calculate the score are:

- **Company Type –** In general, businesses that are corporations are considered less risky. These businesses can typically secure additional financial support if necessary.

- **Age of Business –** How long a business has been operating is a measure of stability. The more years a firm has been operating, the lower the risk.

- **Lawsuits, Liens, Judgements –** The presence and number of open suits, liens, or judgements. (Dun & Bradstreet is the only credit data provider that has public lawsuit filings.) The absence of public filings is considered a positive factor.

- **Net Worth –** A negative net worth is an indication of higher failure risk, whereas a higher net worth is correlated with a reduction in failure risk.

- **Trade Data –** The model incorporates the percentage and dollar amount of satisfactory payment experiences in the Dun & Bradstreet Data Cloud. The higher the percentage of satisfactory trade experiences, the lower the risk. Also, the higher the total number of trade experiences, the lower the failure risk.

## Why Does the D&B Failure Score Matter?

The Failure Score is designed to help you predict a business's potential for failure. It uses the full range of Dun & Bradstreet information, including financials, comparative financial rations, payment trends, public filings, demographic data, and more to provide more predictive insight. Using the Failure Score may help you drive growth and increase profitability by:

- Automating decisions for increased efficiency

- Processing large volumes of transactions more quickly

- Moving valuable resources away from clear approve/decline decisions and focusing them on more complex credit decisions

- Enabling more consistent decisions

- Applying scores across an entire portfolio to quickly identify potential risk and opportunity

- Helping to prioritize collections

- Helping satisfy regulatory requirements for a timely, consistent, and objective decisioning process

## What Does It Mean If Your Business's Failure Score Has Increased or Decreased?

If you've been notified that your business's Failure Score has increased or decreased, consult the infographic below for more detailed information on what this could mean.

## How Can I Check My Business's Failure Score?

You can monitor changes to your company's credit scores and ratings* to better understand how your company is viewed in the marketplace. If you're interested in another company, you can purchase its report or monitor changes to its file as well.

## Who Else Might Check My Business's Failure Score?

Suppliers, lenders, landlords, and customers are just a handful of business partners who could be interested in your company's Failure Score. Businesses and financial institutions often consult Dun & Bradstreet's credit scores in order to help manage risk. A poor Failure Score could make it difficult for your business to access capital or result in less generous loan terms. You could also potentially miss out on lucrative contracts due to concerns about your business's ability to fulfill its financial obligations.



## How Can I Help Impact My Business's Failure Score?

You can take steps to ensure Dun & Bradstreet has up-to-date information about your firm, which may help impact your scores and ratings. You can also regularly check your business's credit file so that potential errors and omissions can be spotted early on. (To learn more about updating your business information for free, visit D-U-N-S® Manager.) Trade References may also help potentially impact scores and ratings, and they can be proactively submitted to Dun & Bradstreet for review, verification, and possible acceptance, via CreditBuilder™ Plus. Finally, CreditSignal®External* is a free tool that will alert you to changes in four of your company's scores and ratings, so you always know what's going on with your file.

Paying your bills on time and proactively submitting Trade References** to Dun & Bradstreet for review, verification, and possible acceptance may help impact your D&B Failure Score.

*CreditSignal only shows certain of your Dun & Bradstreet scores for 14 days, then provides directional changes to such scores. It also indicates the number of individual request(s) for information, which may include but is not limited to credit information, by a unique external customer(s) on a D-U-N-S® Number. To view additional scores and ratings, view scores and ratings following the 14 day period, or learn about what industries are making such requests, we recommend that you upgrade to one of our paid credit monitoring or credit building solutions. Please note, due to the proprietary nature of these inquiries, we do not provide the names of the companies inquiring on your business credit file– only the industries in which they reside.

**Trade References will be added subject to Dun & Bradstreet review, verification, and acceptance. Dun & Bradstreet cannot guarantee that trade references will be accepted or that accepted trade references will impact your business credit file. Please see https://www.dnb.com/resources/what-is-a-trade-reference-impact-credit-scores.html for eligibility, process and other information regarding Trade References.

D&B and Partner Advertisements



Explore Our Solutions



Manage My Business Credit

Monitor and potentially build your business credit

Learn More

## D&B Credit Intelligence

Automated, Powerful Credit Risk Management

Learn More

## Related Articles



ARTICLE

## The 2024 Global Bankruptcy Report

Understand trends in business bankruptcy around the world with Dun & Bradstreet's 2024 Global Bankruptcy Report.

Read More  ›



FILED: NEW YORK COUNTY CLERK 04/14/2025 10:54 AM
INDEX NO. 154851/2025
NYSCEF DOC. NO. 45
RECEIVED NYSCEF: 04/14/2025



ARTICLE

Private Equity Firm Opens Up a New World of Investment Opportunities

The firm leverages Dun & Bradstreet's data and analytics to identify and evaluate investment opportunities

Read More ›



Case 1:25-cv-03439-JGK   Document 13   Filed 04/25/25   Page 22 of 71



ARTICLE

## The 2024 Global Bankruptcy Report

Understand trends in business bankruptcy around the world with Dun & Bradstreet's 2024 Global Bankruptcy Report.

Read More ›

D&B and Partner Advertisements



7/25/24, 11:01 AM    Case 1:25-cv-03439-JGK    Document 13-5    Dun & Bradstreet Filed 04/25/25    Page 23 of 71



Case 1:25-cv-03439-JGK    Document 1-13    Filed 04/25/25    Page 24 of 71

# EXHIBIT 43

4/25/24, 11:00 AM
What is the D&B Viability Rating? | Dun & Bradstreet
Case 1:25-cv-03439-JGK    Document 1-13    Filed 04/26/25    Page 25 of 71



### D&B Viability Rating®

## What Is the Viability Rating?

The D&B Viability Rating is a multi-dimensional rating that delivers a comprehensive assessment of a company's future viability. It combines the deepest measures of risk to deliver a highly reliable rating that analyzes current and future health.

The Viability Rating comprises both predictive and descriptive components. Predictive components predict the likelihood that a company will go out of business, become inactive, or file for bankruptcy over the next 12 months. The descriptive components provide an indication of the amount of predictive data available to make a reliable risk assessment, as well as insight into the age and size of business.

Other scores answer important, but one-dimensional business problems or questions like "Will I get paid?" or "How can I reduce bankruptcy losses?" The Viability Rating helps to answer fundamental questions with more precision:

- Is this a viable business?
- Can I identify growth opportunities with thriving businesses?
- Do I want to initiate or continue a relationship with this business?
- Do I have complete confidence in the depth of data driving my decision?
- Do I have complete visibility into the financial performance of this business?
- Can I increase my objectivity of my risk assessment?
- Can I customize my decisions based on how much there is to know about a company?

## What Does the Viability Rating Look Like?

The Viability Rating is a multidimensional rating comprised of four components: the Viability Score of 1 – 9; the Portfolio Comparison of 1 – 9; the Data Depth Indicator, based on an alphabet scale of A – M; and the Company Profile, based on an alphabet scale of A – Z.





7/25/24, 11:00 AM    Case 1:25-cv-03439-JGK    Document 1-14 Viability Rating - Filed 04/25/25 matters    Page 26 of 71



How is the Viability Rating Calculated?

## Viability Score

The **Viability Score** assesses the probability that a company will no longer be in business within the next 12 months, compared to all US businesses within the Dun & Bradstreet Data Cloud.

Going out of business is defined as:

- Voluntary or involuntary close of business
- Becoming dormant or inactive
- Filing for bankruptcy

## Viability Score Projected Performance Table

| Viability Score | Percent of Total | Out of Business (BAD) Rate | Cumulative Percent of Total | Cumulative Percent of BADS Captured | Cumulative out of Business (BAD) Rate |
|---|---|---|---|---|---|
| 9 | 1% | 65% | 1% | 3% | 65% |
| 8 | 8% | 42% | 8% | 27% | 44% |
| 7 | 14% | 27% | 23% | 55% | 33% |
| 6 | 30% | 13% | 53% | 83% | 21% |
| 5 | 14% | 7% | 67% | 91% | 18% |
| 4 | 14% | 5% | 81% | 96% | 16% |
| 3 | 15% | 3% | 96% | 100% | 14% |
| 2 | 4% | 2% | 100% | 100% | 14% |
| 1 | 0.3% | 0.2% | 100% | 100% | 14% |

Case 1:25-cv-03439-JGK    Document 1-13    Filed 04/26/25    Page 27 of 71

## Portfolio Comparison

The **Portfolio Comparison** assesses the viability of a company, compared to similar businesses, within the same model segment. The type of data used to classify these segments is:

- Available financial data
- Established trade payments
- Limited trade payments
- Firmographics and business activity

## How do I Understand the Portfolio Comparison Table?

As an example, the table below shows how the portfolio comparison is calculated for companies that have established trade payments with Dun & Bradstreet.

- **Portfolio Comparison**: Ranges from 1 to 9, with 1 representing least likelihood and 9 representing highest likelihood of going out of business.
- **Percent of Total**: The percent of US businesses within the Dun & Bradstreet Data Cloud that have a specific Viability Score.
- **Out of Business (Bad) Rate:** The percent of US businesses expected to go bad over next 12 months.
- **Cumulative Percent of Total:** The cumulative percent of US businesses within the Data Cloud that fall within a Viability Score range.
- **Cumulative Percent of "Bads" Captured:** The cumulative percent of bads captured within the score range.
- **Cumulative Out of Business (Bad) Rate:** The cumulative bad rate within a score range.

### Model Segment: Established Trade Payments

| Portfolio Comparison | Percent of Total | Out of Business (BAD) Rate | Cumulative Percent of Total | Cumulative Percent of BADS Captured | Cumulative out of Business (BAD) Rate |
|---|---|---|---|---|---|
| 9 | 3% | 23% | 3% | 13% | 23% |
| 8 | 13% | 11% | 16% | 37% | 13% |
| 7 | 14% | 7% | 30% | 56% | 10% |
| 6 | 9% | 5% | 39% | 65% | 9% |
| 5 | 11% | 5% | 50% | 74% | 8% |
| 4 | 11% | 4% | 62% | 82% | 7% |
| 3 | 11% | 3% | 73% | 89% | 7% |
| 2 | 16% | 3% | 89% | 97% | 6% |
| 1 | 11% | 2% | 100% | 100% | 5% |

## What's the Difference Between the Viability Score and Portfolio Comparison?

The Viability Score assesses the probability that a company will no longer be in business within the next 12 months, compared to all US businesses within the Dun & Bradstreet Data Cloud. It's best used when ranking all businesses within a portfolio.

The Portfolio Comparison refines the viability assessment of a company, comparing it only to businesses assigned a similar "model segment" classification, which is determined by the amount and type of data available. Here, businesses are only ranked along with other businesses that provide financials, have 3+ trades, have 1 or 2 trades, or have no trades.

## Data Depth Indicator

The **Data Depth Indicator** presents the level of predictive data available. This indicator is based on a scale from A – G, where A indicates the greatest level of predictive data, such as financial statements, and G reflects a minimal level of data, such as firmographics only. The indicators H – M are assigned to businesses with special risk circumstances such as bankruptcy, business deterioration, severe risk and others, including:

Case 1:25-cv-03439-JGK    Document 1-1    Filed 04/25/25    Page 28 of 71

- Commercial trading activity

- Financial attributes

- Firmographic data

## Data Depth Indicator Detailed Table

| Data Depth | Description | Level of Insight |
|---|---|---|
| A | Rich firmographics, extensive commercial trading activity, and **comprehensive** financial attributes | Robust Predictions |
| B | Rich firmographics, extensive commercial trading activity, and/or **basic** financial attributes | |
| C | Rich firmographics, extensive commercial trading activity, and **no** financial attributes | Decision Support |
| D | Rich firmographics, **partial** commercial trading activity, and **no** financial attributes | Directional |
| E | Rich firmographics, **sparse** commercial trading activity, and **no** financial attributes | |
| F | **Basic** firmographics, **trace** commercial trading activity, and **no** financial attributes | Basic |
| G | **Basic** firmographics, and **no trade** or financial attributes | |
| H | Out of business | |
| I | Unable to confirm | |
| J | Bankruptcy | |
| K | High-risk - Severe risk | |
| L | Self-reported DUNS Support Record | |
| M | Business deteriorioation – Severe Risk | |

## Company Profile

The **Company Profile** examines how established a company is based on a combination of categories including financial data, trade payments, and demographics on the different categories within the profile include:

- Financial data

- Trade payments

- Years in business

- Company size (number of employees or sales)

- Firmographic data

| Data Depth | Description |
|---|---|
| A | Financials, large, established |
| B | Financials, large, young |
| C | Financials, medium, established |
| D | Financials, medium, young |
| E | Financials, small, established |
| F | Financials, small, young |
| G | 3+ Trade, large, established |
| H | 3+ Trade, large, young |
| I | 3+ Trade, medium established |
| J | 3+ Trade, medium, young |
| K | 3+ Trade, small, established |
| L | 3+ Trade, small, young |
| M | 1-2 Trade, large, established |
| N | 1-2 Trade, large, young |
| O | 1-2 Trade, medium, established |
| P | 1-2 Trade, medium, young |
| Q | 1-2 Trade, small, established |
| R | 1-2 Trade, small, young |
| S | No Trade, large, established |
| T | No Trade, large, young |

Case 1:25-cv-03439-JGK Document 1 Filed 04/26/25 Page 29 of 71

| U | No Trade, medium, established |
|---|---|
| V | No Trade, medium young |
| W | No Trade, small, established |
| X | No Trade, small, young |
| Y | Branch |
| Z | Subsidiary |

## Why Does the Viability Rating Matter?

The Viability Rating provides finance and credit professionals with a comprehensive snapshot of a business and incorporates the most critical information about whether to engage with a company. It builds on Dun & Bradstreet's legacy of providing insight to customers, integrating multiple key risk indicators into industry-leading analytics. This multi-dimensional view includes:

- **Expanded scale** – assessing all levels of business closure, including voluntarily and involuntarily going out of business, becoming dormant or inactive, and bankruptcy

- **Complete context** – evaluating the viability of a company compared to all US businesses and to its peers

- **Total data depth transparency** – indicating how much predictive insight is known based on trade references, financial records, and firmographic data

## How Can I Check My Business's Viability Rating?

By purchasing a Business Information Report on your company, you can view your scores and ratings. You can also monitor changes to your company's credit scores and ratings* to better understand how your company is viewed in the marketplace. If you're interested in another company's business credit file, you can purchase its report or monitor changes to its file as well.

## Who Else Might Check My Business's Viability Rating?

Suppliers, lenders, landlords, and customers are just a handful of business partners who could be interested in your company's Viability Rating. Businesses and financial institutions often consult Dun & Bradstreet's credit scores to help manage risk. A poor Viability Rating could make it difficult for your business to access capital or result in less generous loan terms. You could also potentially miss out on lucrative contracts due to concerns about your business's ability to fulfill its financial obligations.

## How Can I Help Potentially Impact My Business's Viability Rating?

You can take steps to ensure Dun & Bradstreet has up-to-date information about your firm, which may potentially impact your scores and ratings. You can also regularly check your business's credit file to be aware of what it contains. To learn more about requesting updates to your business information for free, visit D-U-N-S® Manager. Trade references* may also potentially impact scores and ratings, and they can be sent to Dun & Bradstreet for approval via CreditBuilder™ Plus. Finally, CreditSignal® † is a free tool that will alert you to changes in four of your company's scores and ratings, so you always know what's going on with your file.

* Trade References will be added subject to Dun & Bradstreet review, verification, and acceptance. Dun & Bradstreet cannot guarantee that trade references will be accepted or that accepted trade references will impact your business credit file. Please see https://www.dnb.com/resources/what-is-a-trade-reference-impact-credit-scores.html for eligibility, process and other information regarding Trade References.

† CreditSignal only shows four of your Dun & Bradstreet scores for 14 days, then provides directional changes to such scores. It also indicates the number of individual request(s) for information, which may include but are not limited to credit information, by a unique external customer(s) on a D-U-N-S® Number. To view additional scores and ratings, view scores and ratings following the 14-day period, or learn about what industries are making such requests, we recommend that you upgrade to one of our paid credit monitoring or credit building solutions.

D&B and Partner Advertisements









Explore Our Solutions

### Manage My Business Credit

Monitor and potentially build your business credit

Learn More

### D&B Finance Analytics

Complete Credit-to-Cash for Global Finance Teams

Learn More

Related Articles



7/25/24, 11:00 AM    Case 1:25-cv-03439-JGK    Document 1-15    Filed 04/26/25    Page 31 of 71

ARTICLE

## Accounts Receivable Industry Report

Use this report from Dun & Bradstreet to benchmark your A/R performance against industry averages.

Read More ›



7/25/24, 11:00 AM Case 1:25-cv-03439-JGK Document 51-35 vlability Rating - Filed 04/25/25 matter Page 32 of 71

ARTICLE

The 2024 Global Bankruptcy Report

Understand trends in business bankruptcy around the world with Dun & Bradstreet's 2024 Global Bankruptcy Report.

Read More ›



7/25/24, 11:00 AM    Case 1:25-cv-03439-JGK    Document 15-1    Viability Rating | Filed 04/26/25 matters    Page 33 of 71

ARTICLE

## New Climate-Related Regulations and Guidance for the Banking Industry

By taking steps to address climate-related risks before regulations are fully implemented, banks can position themselves for success in a changing market.

Read More  ›



Case 1:25-cv-03439-JGK    Document 1-13    Filed 04/25/25    Page 34 of 71

# EXHIBIT 44


The Clearing House®

**Simple, Transparent, Uniform Pricing for All Financial Institutions**

The RTP® network has a single price for all participants with **no volume discounts, no volume commitments and no monthly minimums** to ensure that financial institutions of all sizes participate on the same terms.   Financial institutions pay only for the transactions they originate.

| Network Fees | | |
|---|---|---|
| • Credit Transfer Sent | $0.045 | No network fees apply to any other message sent or received. |
| • Request for Payment Sent | $0.01 | |
| • Remittance Advice Sent | $0.01 | |
| • Prefunded Balance Account Drawdown Request Executed | $2.00 | |
| **Fees owed to other participants** | | |
| • Request for Payment Incentive Fee Upon each successful RTP Credit Transfer sent in response to a Request for Payment message, the participant that initiated the Request for Payment will owe the incentive fee to the participant initiating the RTP credit Transfer | $0.10* | |
| **Network-at-Cost Pass-through** | | |
| • Connectivity • RSA Token | Pass-Through | Overall cost of connectivity associated with either the MPLS or secure VPN connections to the RTP® network will be calculated by TCH and charged on a monthly basis.  Connectivity costs will apply to any participant with a direct connection. |

\* TCH will facilitate the collection and disbursement of RFP Incentive Fees between participants. TCH is not obligated to distribute RFP incentive Fees that TCH is unable to collect from the owing participant.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

PEOPLE OF THE STATE OF NEW YORK,
by LETITIA JAMES, Attorney General of the State of
New York,

                      Petitioner,

      - against -

DAILYPAY, INC.,

                 Respondent.

Index No. _____

---

**MEMORANDUM OF LAW IN SUPPORT OF THE PEOPLE**
**OF THE STATE OF NEW YORK'S VERIFIED PETITION**

LETITIA JAMES
Attorney General of the
State of New York

Christopher L. Filburn
Assistant Attorney General
Bureau of Consumer Frauds & Protection
28 Liberty Street, 20th Floor
New York, New York 10005
212.416.8303

*Counsel for Petitioner People of the State
of New York, by Letitia James, Attorney
General of the State of New York*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 1

I.     DAILYPAY'S ILLEGAL, DECEPTIVE, AND ABUSIVE LENDING PROGRAM ...... 1

II.    THIS SPECIAL PROCEEDING ................................................................................ 5

STATUTORY FRAMEWORK & LEGAL STANDARDS ...................................................... 5

ARGUMENT ...................................................................................................................... 7

I.     DAILYPAY HAS REPEATEDLY AND PERSISTENTLY VIOLATED NEW
YORK LAW BARRING THE RECEIPT OR ACCEPTANCE OF RETURNS IN
EXCESS OF EIGHTEEN PERCENT ANNUALLY FOR WAGE ASSIGNMENTS ...... 7

II.    DAILYPAY HAS REPEATEDLY AND PERSISTENTLY VIOLATED NEW
YORK'S CIVIL AND CRIMINAL USURY CAPS BY COLLECTING INTEREST
IN EXCESS OF SIXTEEN AND TWENTY-FIVE PERCENT ANNUALLY ................. 8

     A.    DailyPay's Paycheck Advances Are Loans ........................................................... 8

     B.    DailyPay Repeatedly and Persistently Committed Usury by Collecting and
Receiving Interest from Mandatory Fees on its Paycheck Advances ................... 11

     C.    DailyPay Repeatedly and Persistently Committed Usury by Collecting and
Receiving Interest from Fees for Paycheck Advances with Immediate Terms .... 12

III.   DAILYPAY HAS ENGAGED IN REPEATED AND PERSISTENT FRAUD AND
ILLEGALITY THROUGH FALSE ADVERTISING AND DECEPTIVE
PRACTICES IN CONNECTION WITH ITS PAYCHECK ADVANCE PROGRAM .. 13

IV.   DAILYPAY HAS REPEATEDLY AND PERSISTENTLY ENGAGED IN
ABUSIVE ACTS AND PRACTICES THROUGH ITS PAYCHECK ADVANCES ..... 15

V.    THE COURT SHOULD ORDER THE RELIEF SOUGHT IN THE PETITION ........... 18

     A.    The Court Should Permanently Enjoin DailyPay's Paycheck Advance
Program and its Deceptive Marketing of Interest-Free Loans ............................. 18

     B.    The Court Should Order an Accounting and Direct DailyPay to Provide
Restitution and Damages, with Interest, to All Affected Consumers ................... 19

i

C.    The Court Should Award Penalties and Costs to the OAG ................................... 20

CONCLUSION .......................................................................................................................... 22

ii

## TABLE OF AUTHORITIES

### CASES

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
    37 N.Y.3d 320 (2021) ....................................................................... *passim*

*AJ Partners, LLC v. L&V Post Realty, LLC*,
    61 Misc. 3d 521 (Sup. Ct. 2018).......................................................... 10

*Avola v. Louisiana-Pac. Corp.*,
    991 F. Supp. 2d 381 (E.D.N.Y. 2013) ............................................... 16

*Bernstein Family Ltd. P'ship v. Sovereign Partners, L.P.*,
    66 A.D.3d 1 (1st Dep't 2009) .............................................................. 7

*Bond v. Dentzer*,
    494 F.2d 302 (2d Cir. 1974) ............................................................ 8, 20

*Bouffard v. Befese, LLC*,
    111 A.D.3d 866 (2d Dep't 2013) .......................................................... 9

*CFPB v. Access Funding, LLC*,
    No. 16 Civ. 3759, 2021 WL 2915118 (D. Md. Jul. 12, 2021)......................... 18

*CFPB v. Fifth Third Bank, N.A.*,
    No. 21 Civ. 262, 2023 WL 7325956 (S.D. Ohio Sep. 26, 2023)..................... 18

*CFPB v. ITT Educ. Servs., Inc.*,
    219 F. Supp. 3d 878 (S.D. Ind. 2015) ...................................... 18, 19

*CFPB v. Law Offices of Crystal Moroney*,
    63 F.4th 174 (2d Cir. 2023) ............................................................... 15

*CFPB v. Navient Corp.*,
    No. 17 Civ. 101, 2017 WL 3380530 (M.D. Pa. Aug. 4, 2017)...................... 19

*CFPB v. NDG Fin. Corp.*,
    No. 15 Civ. 5211, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016)............... 15, 17

*Concourse Green Assocs., LP v. Patterson*,
    53 Misc. 3d 1206(A) (Civ. Ct. Oct. 7, 2016) ....................................... 8

*Echeverria v. Estate of Lindner*,
    7 Misc. 3d 1019(A) (Sup. Ct. 2005) .................................................. 11

*FTC v. Crescent Pub. Grp., Inc.*,
    129 F. Supp. 2d 311 (S.D.N.Y. 2001)................................................. 16

iii

*FTC v. Shkreli*,
    581 F. Supp. 3d 579 (S.D.N.Y. 2022) ........................................................ 6

*Gaidon v. Guardian Life Ins. Co.*,
    94 N.Y.2d 330 (1999) ........................................................................... 15

*Gratton v. Dido Realty Co., Inc.*,
    89 Misc. 2d 401 (Sup. Ct. 1977) ........................................................... 14

*Guerin v. N.Y. Life Ins. Co.*,
    184 Misc. 530 (Sup. Ct. 1945) ............................................................. 11

*Hall v. Eagle Ins. Co.*,
    151 A.D. 815 (1st Dep't 1912) ............................................................. 10

*Hammelburger v. Fourson Inn Corp.*,
    54 N.Y.2d 580 (1981) ........................................................................... 21

*Hawkins v. Eaves*,
    134 A.D.3d 1221 (3d Dep't 2015) ......................................................... 12

*Haymount Urgent Care PC v. GoFund Advance, LLC*,
    609 F. Supp. 3d 237 (S.D.N.Y. 2022) ................................................... 11

*I&M Acquisition Corp.*,
    No. 95 Civ 2114 ,1995 WL 606353 (S.D.N.Y. Oct. 16, 1995) ............... 8

*In re Gas Reclamation, Inc. Secs. Litig.*,
    M.D.L. 665, 1991 WL 67479 (S.D.N.Y. Apr. 22, 1991) ........................ 13

*In re Renshaw*,
    222 F.3d 82 (2d Cir. 2000) .................................................................... 9

*Lugli v. Johnston*,
    78 A.D.3d 1133 (2d Dep't 2010) ..................................................... 12, 13

*Meyers Bros. Parking Sys. v. Sherman*,
    87 A.D.2d 562 (1st Dep't 1982) ........................................................... 22

*O'Donovan v. Galinski*,
    62 A.D.3d 769 (2d Dep't 2009) ............................................................. 12

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,
    85 N.Y.2d 20 (1995) ............................................................................. 14

*Pennsylvania v. Think Fin., Inc.*,
    No. 14 Civ 7139, 2019 WL 6217376 (E.D. Pa. Nov. 20, 2019) .............. 17

iv

*People v. 21st Century Leisure Spa Int'l Ltd.,*
   153 Misc. 2d 938 (Sup. Ct. 1991))...................................................... 21

*People v. Alta Colleges, Inc.,*
   No. 14 Civ. 3786, 2014 WL 4377579 (N.D. Ill. Sep. 4, 2014)...................... 17

*People v. Apple Health & Sports Clubs, Ltd.,*
   206 A.D.2d 266 (1st Dep't 1994))...................................................... 7

*People v. Applied Card Sys., Inc.,*
   27 A.D.3d 104 (3d Dep't 2005) ................................................... 7, 15

*People v. Beach Boys Equip. Co.,*
   273 A.D.2d 850 (4th Dep't 2000)...................................................... 20

*People v. Daro Chartours, Inc.,*
   72 A.D.2d 872 (3rd Dep't 1979).................................................. 20, 22

*People v. Gen. Elec. Co.,*
   302 A.D.2d 314 (1st Dep't 2003) ............................................ 6, 7, 15, 21

*People v. Greenberg,*
   27 N.Y.3d 490 (2016) .................................................................. 19

*People v. Greenberg,*
   95 A.D. 474 (1st Dep't 2012) ...................................................... 15, 20

*People v. Midland Equities,*
   117 Misc. 2d 203 (Sup. Ct. 1982) ..................................................... 22

*People v. Nationwide Asset Servs., Inc.,*
   26 Misc. 3d 258 (Sup. Ct. 2009) ...................................................... 20

*People v. Orbital Publishing Grp., Inc.,*
   169 A.D.3d 564 (1st Dep't 2019) .................................................. 7, 16

*People v. Richmond Capital Group LLC,*
   80 Misc. 3d 1213(A) (Sup. Ct. 2023) .............................................. 20, 21

*People v. Telehublink Corp.,*
   301 A.D.2d 1006 (3d Dep't 2005).............................................. 7, 21, 22

*People v. Trump Entrepreneur Initiative LLC,*
   137 A.D.3d 409 (1st Dep't 2016) ...................................................... 7

*People v. Veleanu,*
   89 A.D.3d 950 (2d Dep't 2011)........................................................ 21

v

*People v. Wilco Energy Corp.*,
    284 A.D.2d 469 (2d Dep't 2001) ................................................ 22

*People v. World Interactive Gaming Corp.*,
    185 Misc. 2d 852 (Sup. Ct. 1999) .............................................. 22

*Pirs Cap., LLC v. D&M Truck, Tire & Trailer Repair Inc.*,
    69 Misc. 3d 457 (Sup. Ct. 2020) ............................................... 11

*Rubenstein v. Small*,
    273 A.D. 102 (1st Dep't 1947) .................................................. 11

*Russkaya Reklama, Inc. v. Milman*,
    47 Misc. 3d 88 (2d Dep't App. Term 2015) .............................. 12

*Sistenstein v. Manufs. Hanover Fin. Servs.*,
    138 Misc. 2d 140 (Sup. Ct. 1988) ........................................ 9, 20

*State v. Princess Prestige Co., Inc.*,
    42 N.Y.2d 104 (1977) ..................................................... 6, 19, 20

*State v. Scottish-Am. Ass'n, Inc.*,
    52 A.D.2d 528 (1st Dep't. 1976) ......................................... 6, 20

**STATUTES**

12 U.S.C. § 5481 ........................................................................... 17

12 U.S.C. § 5531 ........................................................................... 17

12 U.S.C. § 5565 ........................................................................... 22

N.Y. Banking Law § 14-a ................................................................ 9

N.Y. Executive Law § 63(12) ................................................. 1, 6, 20

N.Y. General Business Law § 349 .................................................... 7

N.Y. General Business Law § 350 .......................................... 7, 15, 22

N.Y. General Business Law § 600 .................................................. 10

N.Y. General Obligations Law § 5-501 ........................................ 9, 12

N.Y. Penal Law § 190.40 ................................................................. 9

N.Y. Personal Property Law § 46 ..................................................... 8

N.Y. Personal Property Law § 46-F .................................................. 8

## RULES & REGULATIONS

61 Fed. Reg. 49237 (Sep. 19, 1996). ........................................................................... 13

88 Fed. Reg. 21883 (Apr. 12, 2023) ..................................................................... 17, 19

89 Fed. Reg. 61358 (Jul. 31, 2024). ........................................................................... 14

CPLR art. 4 ...................................................................................................................... 7

CPLR § 410 ....................................................................................................................... 7

CPLR § 8303 .................................................................................................................... 22

## OTHER AUTHORITIES

72 N.Y. Jur. 2d § 142 .................................................................................................. 9, 21

## PRELIMINARY STATEMENT

The New York State Office of the Attorney General (the "OAG"), on behalf of Petitioner People of the State of New York, brings this special proceeding under Executive Law § 63(12) to enjoin DailyPay, Inc.'s ("DailyPay" or "the Company") illegal and deceptive acts and practices and to obtain restitution, damages, other equitable relief, civil penalties, and costs.

As set forth in the accompanying Verified Petition, cited herein as "Pet. ¶ __," DailyPay makes small-dollar, short-term loans to workers and repays itself via paycheck deductions secured by workers' assigned wages, which employers are obligated to pay to DailyPay first. The Company profits by charging exorbitant amounts—its typical loans carry costs of credit from 200% to 750% annualized percentage rate, or APR—making DailyPay's takings illegal and its lending usurious. Yet the Company falsely advertises "interest free" loans, deceptively promotes immediate funds availability at no cost, and promises illusory financial benefits. In fact, DailyPay's abusive business model generates the bulk of its profits from fees paid by workers whose reduced paychecks make them utterly dependent on regular access to DailyPay's costly credit, all while the Company remains indifferent to the financial harm caused by its high-cost lending. The OAG therefore respectfully requests that the Court grant the Petition in all respects.

## STATEMENT OF FACTS

The facts summarized below are set forth in detail in the Petition, which are substantiated by the accompanying affirmation of Christopher L. Filburn and exhibits attached thereto.

## I.     DAILYPAY'S ILLEGAL, DECEPTIVE, AND ABUSIVE LENDING PROGRAM

DailyPay makes short-term, small-dollar loans, referred to herein as Paycheck Advances, to working-class employees. (*See generally* Pet. ¶¶ 16–21.) To do so, DailyPay contracts with employers, targeting industries such as fast food or retail in which workers work for hourly wages. (Pet. ¶ 18.) Employers agree to make DailyPay their exclusive lender and to assist the Company

in touting its lending program as a benefit to their employees. (Pet. ¶¶ 32–36.) The resulting loans are costly: a median Paycheck Advance is for roughly $75 and repaid in eight days with a $2.99 fee, reflecting an APR of nearly 200% (Pet. ¶ 54), while the most common transaction—a seven-day, $20 Paycheck Advance—carries an APR of more than 750%. (Pet. ¶ 54.)

DailyPay advertises to both employers and employees. (Pet. ¶¶ 23–46.) To employers, the Company proclaims that workers want access to short-term credit and that its program will boost recruitment and retention. (Pet. ¶¶ 23–27.) To employees, DailyPay promotes free enrollment and on-demand funds access without mention of fees. (Pet. ¶¶ 38–46.) DailyPay also claims access to its lending program will improve workers' financial wellbeing. (Pet. ¶¶ 28–29.)

Employers enter into Master Service Agreements ("MSAs") that make DailyPay their exclusive lender. (Pet. ¶ 32.) Under the terms of the MSAs, employers agree to promote Paycheck Advances to employees and to route employee paychecks to DailyPay on payday. (Pet. ¶ 33.) Through its MSAs, DailyPay obtains real-time payroll data, which the Company uses to determine the amount of money to offer employees in the form of Paycheck Advances. (Pet. ¶ 65.)

DailyPay's loans are expensive. For certain employers, workers pay a mandatory fee for each Paycheck Advance. (Pet. ¶ 20.) Today, workers can select either a Paycheck Advances with an immediate term (and immediate funds) for a fee up to $3.99 or a Paycheck Advance with a term that begins 24 to 48 hours later for a fee between $0.00 and $1.99. (Pet. ¶ 20.) While seemingly nominal, the median fee of $2.99 reflects a cost of credit for the typical eight-day, $75 Paycheck Advance of nearly 200% APR. (Pet. ¶ 58.) In total, DailyPay collected more than $27 million in fees from New York workers between October 1, 2020 to December 31, 2024 (the "Data Period") (Pet. ¶ 55), with more than nine out of every ten fee-based loans carrying an APR above 50% and more loans with an APR above 1,000% than below 50%, as shown below ((Pet. ¶¶ 59–60):

2

Case 1:25-cv-03439-JGK    Document 1-13    Filed 04/25/25    Page 46 of 71



As collateral, DailyPay obtains assignments of workers' wages in amounts sufficient to repay itself and collect its fees. (Pet. ¶¶ 53, 67.) The Company uses payroll data to make loans in amounts that it knows it will be able to collect (plus fees) from future paychecks. (Pet. ¶ 65.) Workers must consent to having their paychecks sent to DailyPay on payday (Pet. ¶¶ 68) and agree to support the Company's collection efforts (Pet. ¶¶ 67–68, 85–88). Workers also agree that they will hold funds in trust and repay DailyPay if their employers make payroll errors. (Pet. ¶ 89.) Failure to make these payments is a breach of contract that relieves DailyPay of its promises to not sue or engage in debt collection. (Pet. ¶¶ 89–91.) And for years workers authorized DailyPay to directly debit their bank accounts to recover missing funds. (Pet. ¶ 90.)

DailyPay also engages in credit underwriting of employers. (*See* Pet. ¶¶ 70–83.) Employers provide financial data for credit committee review. (Pet. ¶¶ 80–81.) The extent of the assessment is determined by size, as larger employers present greater risk. (Pet. ¶ 72.) For at-risk employers, DailyPay employs credit enhancements, such as quarterly reviews or letters of credit. (Pet. ¶ 82.) And employers agree to provide regular updates so that DailyPay can monitor and take corrective action to address deteriorating credit profiles. (Pet. ¶ 80.) Finally, employers are required to cover

3

payroll shortfalls within two or thirty days, depending on size, and DailyPay can take legal action to collect amounts it is owed if employers fail to make their payments. (Pet. ¶ 84.)

These credit and collateral practices effectively act as a guarantee: DailyPay collected on between 99.92% and 99.99% of its loans during the Data Period. (Pet. ¶¶ 92.)

While DailyPay collects everything it is owed, workers are dependent: they obtain one or more Paycheck Advances, receive smaller paychecks, and soon need more loans. (*See* Pet. ¶ 94.) DailyPay touts this dependency to investors, claiming that it will extract hundreds of dollars from workers each year on average through fees on twice-weekly Paycheck Advances. (Pet. ¶¶ 98–101.) And the Company encourages recurring use by sending balance updates after every day employees earn additional wages, prompting workers to take out additional loans. (Pet. ¶¶ 109–12.)

The results are staggering: More than 75% of the Company's revenue comes from less than half of all enrolled employees, each of whom obtain more than two Paycheck Advances each week on average. (Pet. ¶ 103.) And workers who become wholly dependent on quick and ready access to Paycheck Advances—defined as workers who obtain a new loan ***every other day or more***—generate nearly half of the Company's fee revenue each year (Pet. ¶ 104), as shown below:



(Pet. ¶ 104.) Through its lending program, DailyPay is extracting hundreds of dollars annually from workers through entirely unsustainable financial behavior. (Pet. 106–08.)

In all, nearly three out of every five Paycheck Advances DailyPay makes are to employees who took another loan two or fewer days earlier. (Pet. ¶ 105.) Yet unlike responsible lenders who must assess the effects of repeat obligations, DailyPay's control of loan size, its right of first access to pay, and its credit underwriting ensures that it faces no risk of loss (Pet. ¶¶ 64–92, 109.)

## II.    THIS SPECIAL PROCEEDING

In support of this special proceeding, the OAG submits: DailyPay marketing materials; representative copies of key contracts; data analyses on transaction-level data for all Paycheck Advances made to New York workers, which is memorialized in a sworn affidavit of an OAG data scientist; policy and procedure documents that reflect DailyPay's credit underwriting practices; and sworn testimony of a designated DailyPay corporate representative.

## STATUTORY FRAMEWORK & LEGAL STANDARDS

New York's longstanding public policy is to protect its residents from illegal, fraudulent, and deceptive business practices, and to restrain such practices from occurring. The OAG, as the representative for Petitioner People of the State of New York, enforces this policy.

New Yorks' Executive Law § 63(12) empowers the OAG to seek injunctive and other relief when a person or business engages in repeated or persistent illegal conduct. Illegality includes violations of state or federal law. *E.g.*, *FTC v. Shkreli*, 581 F. Supp. 3d 579, 627–28 (S.D.N.Y. 2022) (Sherman Act); *State v. Scottish-Am. Ass'n, Inc.*, 52 A.D.2d 528, 528 (1st Dep't. 1976) (federal regulations). Conduct is "repeated" if it "affects more than one person," and conduct is "persistent" if there is a "continuance or carrying on" of such conduct. Exec. Law § 63(12). The OAG is not required to establish a particular numerical threshold or a significant percentage of violations. *State v. Princess Prestige Co., Inc.*, 42 N.Y.2d 104, 107 (1977).

5

Executive Law § 63(12) also empowers the OAG to seek injunctive and other relief for fraud, which the statute defines broadly to include any act that "has the capacity or tendency to deceive" or that "creates an atmosphere conducive to fraud." *People v. Gen. Elec. Co.*, 302 A.D.2d 314, 314 (1st Dep't 2003). New York's Executive Law protects "not only the average consumer, but also the ignorant, the unthinking and the credulous." *Id.* (quotations omitted).

Similarly, New York's General Business Law ("GBL") bars both false advertising and deceptive "acts or practices in the conduct of any business, trade or commerce," authorizing the OAG to sue for injunctive and other relief. GBL §§ 349(a)–(b), 350. Acts or practices are deceptive if they are "likely to mislead a reasonable consumer acting reasonably under the circumstances." *People v. Applied Card Sys., Inc.*, 27 A.D.3d 104, 107 (3d Dep't 2005) (quotations omitted). And advertising is false under New York law if it creates an "overall misleading impression." *People v. Orbital Publishing Grp., Inc.*, 169 A.D.3d 564, 566 (1st Dep't 2019).

To establish fraud and deception under these state statutes, the OAG need not demonstrate the traditional elements of common law fraud, such as intent to deceive and reliance. *People v. Trump Entrepreneur Initiative LLC*, 137 A.D.3d 409, 417 (1st Dep't 2016); *Gen. Elec. Co.*, 302 A.D.2d at 315; *see also People v. Apple Health & Sports Clubs, Ltd.*, 206 A.D.2d 266, 267 (1st Dep't 1994), *leave to appeal dismissed*, 84 N.Y.2d 1004 (1994).

Finally, to promote New York's policy interests, the OAG is authorized to bring a special proceeding, which is "an expeditious means for the Attorney General to prevent further injury and seek relief for the victims of business fraud." *Apple Health*, 206 A.D.2d at 268. A special proceeding is "brought on with the ease, speed, and economy of a mere motion." *Bernstein Family Ltd. P'ship v. Sovereign Partners, L.P.*, 66 A.D.3d 1, 8 (1st Dep't 2009) (quotations omitted). It is governed by CPLR Article 4, which requires courts to make summary determinations to the extent

6

that no triable issues of fact are raised, applying "the same standards that apply to a motion for summary judgment." *People v. Telehublink Corp.*, 301 A.D.2d 1006, 1007 (3d Dep't 2005); *see also* CPLR § 410 (all remaining issues of material fact must be tried "forthwith").

## ARGUMENT

## I. DAILYPAY HAS REPEATEDLY AND PERSISTENTLY VIOLATED NEW YORK LAW BARRING THE RECEIPT OR ACCEPTANCE OF RETURNS IN EXCESS OF EIGHTEEN PERCENT ANNUALLY FOR WAGE ASSIGNMENTS

Article 3-A of New York's Personal Property Law prohibits any person from receiving or accepting "a greater sum than at the rate of eighteen per centum per annum" as "a bonus, interest or otherwise" in exchange for "any advance or loan of money" on "earnings assigned outright' or on "the security of an assignment of any earnings." P.P.L. § 46-F; *see Bond v. Dentzer*, 494 F.2d 302, 309 (2d Cir. 1974) (Section 46-F "limits the amount" collectible on a wage assignment). This prohibition is one of several "procedural and substantive safeguards" that were adopted to "protect the wage earner." *Bond*, 494 F.2d at 309 (2d Cir. 1974); *see also id.* at 309 & n.4 (analogizing Article 3-A to banking laws enacted "to protect from exorbitant and unconscionable demands the poor and needy who are compelled to borrow small sums to meet a pressing necessity").

Article 3-A governs "any assignment of or order for payment of any earnings," including "any salary, wages, commissions, or other compensation." P.P.L. §§ 46(1), 46(3). DailyPay's Paycheck Advance program falls within this scope, as employees grant all right, title, and interest in their wages (Pet. ¶ 53), the Company stands in their shoes to obtain earnings (Pet. ¶ 67), and employers must send earnings to DailyPay. (Pet. ¶¶ 68–69.) These acts are wage assignments. *See Concourse Green Assocs., LP v. Patterson*, 53 Misc. 3d 1206(A), at *7 (Civ. Ct. Oct. 7, 2016) (assignment is a transfer of "the whole of the right, interest, or property"); *I&M Acquisition Corp.*, No. 95 Civ. 2114, 1995 WL 606353, at *5 (S.D.N.Y. Oct. 16, 1995) (assignment is an "act of transferring to another all or part of one's property, interest, or rights").

7

The majority of Paycheck Advances—about nine in every ten, and more than 99% of all fee-based loans—result in DailyPay's receipt and acceptance of fees that exceed Section 46-F's eighteen percent cap. (Pet. ¶ 62.) These wage assignments are void and DailyPay's takings of wages therefore constitute repeated and persistent illegality. *See Sistenstein v. Manufs. Hanover Fin. Servs.*, 138 Misc. 2d 140, 145–46 (Sup. Ct. 1988) (assignments that violate Article 3-A are a "nullity" and not a valid basis for wage collection); *see also* 72 N.Y. Jur. 2d § 142 (assignments that "exceed the prescribed statutory rate [are] void and invalid for any purpose").

## II.    DAILYPAY HAS REPEATEDLY AND PERSISTENTLY VIOLATED NEW YORK'S CIVIL AND CRIMINAL USURY CAPS BY COLLECTING INTEREST IN EXCESS OF SIXTEEN AND TWENTY-FIVE PERCENT ANNUALLY

In New York, lenders who charge or receive interest on loans in excess of 25% annually commit criminal usury, Penal Law § 190.40, and lenders who charge or receive interest on loans in excess of 16% annually commit civil usury, G.O.L. § 5-501(1); Banking Law § 14-a(1).

### A.    DailyPay's Paycheck Advances Are Loans

New York's usury statutes bar excessive interest on a "loan" but do not define "loan." The "classic definition" of a loan under New York law is "(i) a contract, whereby (ii) one party transfers a defined quantity of money, goods, or services, to another, and (iii) the other party agrees to pay for the sum or items transferred at a later date." *In re Renshaw*, 222 F.3d 82, 88 (2d Cir. 2000). DailyPay's Paycheck Advances readily satisfy this test: workers agree to the Company's "Program Terms" (Pet. ¶ 47); DailyPay transfers money in exchange (Pet. ¶¶ 48–53); and workers agree to repay the Company through later wage deductions, agree to facilitate those deductions, and agree to make payments directly to DailyPay under certain circumstances (Pet. ¶¶ 48–53).

DailyPay's refusal to call its Paycheck Advances loans or to call itself a lender is irrelevant. "When determining whether a transaction is a loan, substance—not form—controls." *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 334 (2021); *see also Bouffard v. Befese, LLC*, 111

A.D.3d 866, 869 (2d Dep't 2013) (courts must consider a transaction "in its totality" and by "its real character, rather than by the name, color, or form which the parties have seen fit to give it."). This holistic inquiry is necessary because the "usurer usually seeks to conceal the usury, and to accomplish his purpose by indirect methods." *Adar Bays*, 37 N.Y.3d at 339.

Paycheck Advances are loans. The First Department, in an opinion later cited by the Court of Appeals in its extensive discussion of New York's usury laws in *Adar Bays*, explained that the "essential" element of a loan "is that there should be an advance of a sum of money from the lender to the borrower which is to be repaid either by the borrower personally or out of his property." *Hall v. Eagle Ins. Co.*, 151 A.D. 815, 823 (1st Dep't 1912). DailyPay's advancing of funds in exchange for assigned rights to future wages (Pet. ¶¶ 48–53) satisfies this essential element.

DailyPay also acts like a lender. The Company sizes its Paycheck Advances to ensure collection (Pet. ¶ 65), it obtains collateral in the form of wage assignments (Pet. ¶ 53), it assesses the credit quality of parties required to pay those wages (Pet. ¶¶ 71–83), and it retains legal rights as to both employees and employers as security for payment or wages (Pet. ¶¶ 84, 89–91). Thus, from the Company's "point of view, it has taken the risk of extending credit" based on both its assessment of "creditworthiness" and its assessment of the value of the "security for the loan." *AJ Partners, LLC v. L&V Post Realty, LLC*, 61 Misc. 3d 521, 525 (Sup. Ct. 2018).

DailyPay's advances to workers in exchange for rights to claim portions of workers' future paychecks are not transformed into something other than loans merely because the Company also promises not to sue or collect debt. As a factual matter, this promise is illusory: DailyPay imposes recourse-like obligations on workers—to hold money for its benefit, to pay it back, and to permit it to debit their bank accounts—and breach of these obligations releases DailyPay of its promise. (Pet. ¶¶ 67, 89–91.) As a legal matter, recourse is not a requirement for the creation of debt. *See*

9

GBL § 600(6) (defining "debt" any merely "any obligation or alleged obligation of a consumer to pay money"); *see also Guerin v. N.Y. Life Ins. Co.*, 184 Misc. 530, 539 (Sup. Ct. 1945) ("the personal obligation of the borrower was not essential to create a valid loan").

Instead, in New York "a true loan" provides "for repayment" or "that the principal in some way" is "secured as distinguished from being put in hazard." *Rubenstein v. Small*, 273 A.D. 102, 104 (1st Dep't 1947). Here, either prong is satisfied. DailyPay has absolute repayment rights: employers are obligated to repay in all cases (Pet. ¶ 84) and employees must facilitate repayment and at times have direct obligations to repay (Pet. ¶¶ 89–91). Employees cannot avoid repayment by directing employers not to pay DailyPay. (Pet. ¶ 68.) And DailyPay's credit underwriting and collateral practices separately ensure that amounts it is owed are never in hazard—as evidenced by its 99.99% collection rate, among other facts (Pet. ¶ 92)—making them loans. *See Echeverria v. Estate of Lindner*, 7 Misc. 3d 1019(A), at *5–9 (Sup. Ct. 2005) (assignment of anticipated litigation proceeds was usurious loan based on "a very low probability that judgment would not be in favor of the" borrower despite formal assignment and limit of recovery to proceeds).

These facts distinguish DailyPay from a purchaser of receivables who at times may not be a lender. As courts have held, receivable purchases are open-ended and involve uncertainties and contingencies. *See Pirs Cap., LLC v. D&M Truck, Tire & Trailer Repair Inc.*, 69 Misc. 3d 457, 463 (Sup. Ct. 2020) (contrasting loans as "repayable (with interest) over a finite period *defined*" with receivables that have "non-finite" terms and are "contingent" on receivable generation "for the purchaser to collect"). By contrast, DailyPay guarantees its own collection of amounts owed through credit underwriting and legal obligations. *Cf. Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 247–49 (S.D.N.Y. 2022) (sales of receivables involve "a real transfer of risk" that future activity will generate "less-than-expected or no revenues").

**B.      DailyPay Repeatedly and Persistently Committed Usury by Collecting and Receiving Interest from Mandatory Fees on its Paycheck Advances**

New York law defines interest as "any money, goods, or things in action" taken or received on a loan, including "any and all amounts paid or payable, directly or indirectly, by any person, to or for the account of the lender in consideration for making the loan." G.O.L. § 5-501(2). This definition is "construed broadly" to cover "all goods and promises exchanged in consideration for a loan." *Adar Bays*, 37 N.Y.3d at 336. For short-term loans like the Paycheck Advances, a loan's "annualized interest rate must be ascertained in order to assess whether the note is usurious." *Russkaya Reklama, Inc. v. Milman*, 47 Misc. 3d 88, 90 (2d Dep't App. Term 2015).

DailyPay's typical Paycheck Advance is $77.99 for a $2.99 fee, for which the Company advances the worker $75, representing the $77.99 less the fee, and then receives the right to deduct $77.99 from a paycheck in eight days. (Pet. ¶¶ 4, 54.) In consideration for this $75 loan, DailyPay receives promises from the employer to absolutely repay $77.99 and promises from the employee to ensure collection. (Pet. ¶¶ 68–69.) The value of these promises is at least $77.99, reflecting $2.99 in interest to DailyPay. *See O'Donovan v. Galinski*, 62 A.D.3d 769, 769–70 (2d Dep't 2009) (treating $4,650 as interest when lender collected $34,650 in exchange for $30,000 loan). On an eight-day, $75 loan, this $2.99 in interest reflects an APR of nearly 200%. (Pet. ¶ 54.)

DailyPay's decision to label its charges as "fees" rather than "interest" does not alter the legal conclusion. The Court of Appeals instructs courts to pay "strict attention to additional fees exacted sometimes creatively through loan instruments." *Adar Bays*, 37 N.Y.3d at 336. And courts have little trouble treating fees as interest. *See Lugli v. Johnston*, 78 A.D.3d 1133, 1135 (2d Dep't 2010) (reversing judgment for lender because combination of stated interest rate and "loan origination fee" resulted in usurious lending); *see also Hawkins v. Eaves*, 134 A.D.3d 1221, 1223

11

(3d Dep't 2015) (payment of "points" amounting to 14.5% interest rate plus stated interest rate of 12% results in "a criminally usurious interest rate in excess of 25%").

Because its Paycheck Advances are loans and its fees are interest, DailyPay engaged in repeated and persistent illegality through its usurious lending for all Paycheck Advances provided to workers whose employers included mandatory fees for any loan. (Pet. ¶ 20.) Across the entire Data Period, DailyPay collected fees at costs above 16% APR on more than 99.5% of these loans and above 25% APR on more than 99.3% of these loans. (Pet. ¶¶ 61, 63.)

### C. DailyPay Repeatedly and Persistently Committed Usury by Collecting and Receiving Interest from Fees for Paycheck Advances with Immediate Terms

DailyPay also engaged in repeated and persistent illegality through usurious lending since by charging and collecting fees of up to $3.99 on Paycheck Advances where funds were advanced immediately and thus the term of the loan began immediately. (Pet. ¶ 20.)

DailyPay cannot rely on the fact that consumers choose loans with immediate terms for fees over loans with terms that begin one or two days later and may have smaller (or no) fees. This is not a case where the Company is offering one loan but charges some fee for an ancillary feature. The start of a loan term is an integral factor, as it defines, among other factors, when a borrower obtains access to funds and when interest begins to accrue. *See In re Gas Reclamation, Inc. Secs. Litig.*, M.D.L. 665, 1991 WL 67479 (S.D.N.Y. Apr. 22, 1991) (interest does not accrue "until the loan [i]s actually extended, since until that time there [is] no unpaid principal balance") (quotations omitted). Thus, DailyPay is offering two loans, only one of which has an immediate term, and fees paid in consideration for that immediate term (and immediate use funds) are interest. *See Lugli*, 78 A.D.3d at 1135 (fee was interest as "the law looks not to its form, but its substance, or real character"); *see* 61 Fed. Reg. 49237, 49239 (Sep. 19, 1996) (fee for debt cancellation feature was interest because fee was "incident to *that particular extension of credit*") (emphasis added).

12

The Consumer Financial Protection Bureau reached this same straightforward conclusion in its recently proposed interpretive rule explaining that short-term "earned wage products" such as DailyPay's Paycheck Advances are extensions of credit under federal consumer lending laws. 89 Fed. Reg. 61358, 61358 (Jul. 31, 2024). As the Bureau cogently reasoned, when consumers "opt for faster funds" when taking a Paycheck Advance, the "resulting speed is a feature of the credit extended, so the resulting fee is part of the cost of credit." *Id.* at 61362.

Any claim to the contrary is pure artifice. If on January 1, 2024, a lender offered a consumer $1,000 loan that began immediately and ran to December 31, 2024, to be repaid in a single $1,400 payment, a court would readily identify a usurious loan with 40% interest. Were the same lender to then offer a $1,000 loan beginning on January 4, 2024 to be repaid in a single $1,100 payment, the existence of this roughly 10% interest loan would not, by magic or fiat, transmute the prior usurious loan into one with a 10% interest rate and $300 "fee." DailyPay's making of some non-usurious loans does not immunize it from its extensive usurious lending. *See Adar Bays*, 37 N.Y.3d at 342 ("[I]f the court can see that the real transaction was the loan or forbearance of money at usurious interest, its plain and imperative duty is to so declare.") (quotations omitted).

Finally, even in limited (and inapplicable) contexts where lenders are permitted by statute to pass fees on to borrowers, they may pass on only the "reasonable, actual expenses of the transaction." *Gratton v. Dido Realty Co., Inc.*, 89 Misc. 2d 401, 404 (Sup. Ct. 1977). DailyPay's fees of up to $3.99 to cover costs of less than 5 cents (Pet. ¶ 51) are not reasonable. (*See also* Pet. ¶ 51 ($100 million increase in fees accompanied by less than 1% increase in costs).)

### III. DAILYPAY HAS ENGAGED IN REPEATED AND PERSISTENT FRAUD AND ILLEGALITY THROUGH FALSE ADVERTISING AND DECEPTIVE PRACTICES IN CONNECTION WITH ITS PAYCHECK ADVANCE PROGRAM

New York's Executive Law and GBL authorize the OAG to act to protect the "right to an honest market place." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85

N.Y.2d 20, 25 (1995); *see People v. Greenberg*, 95 A.D. 474, 483 (1st Dep't 2012) (Executive Law § 63(12) is to be "liberally construed to defeat all unsubstantial and visionary schemes whereby the public is fraudulently exploited"). These laws bar acts or practices with "the capacity or tendency to deceive, or creates an atmosphere conducive to fraud," *Gen. Elec. Co.*, 302 A.D.2d at 314, or that are capable of deceiving a reasonable person, *Gaidon v. Guardian Life Ins. Co.*, 94 N.Y.2d 330, 348 (1999). The federal Consumer Financial Protection Act similarly seeks to ensure "that markets for consumer financial products and services are fair, transparent, and competitive." *CFPB v. Law Offices of Crystal Moroney*, 63 F.4th 174, 184 (2d Cir. 2023). It thus bars acts or practices "likely to mislead consumers acting reasonably." *CFPB v. NDG Fin. Corp.*, No. 15 Civ. 5211, 2016 WL 7188792, at *14 (S.D.N.Y. Dec. 2, 2016). Finally to establish false advertising under New York's GBL § 350, the OAG must establish that DailyPay made "representations or omissions . . . likely to mislead a reasonable consumer acting reasonably under the circumstances," but need to show "fraud" or the elements thereof. *Applied Card*, 27 A.D.3d at 106–07. DailyPay runs afoul of these prohibitions in several ways, including the following:

*First*, DailyPay markets its Paycheck Advances as being "interest free" or charging "no interest." (Pet. ¶¶ 38–46.) This is false. (*See supra* at 11–13.) Even if employees eventually learn about fees—which does not cleanse any prior deception, *Gaidon*, 94 N.Y.2d at 345—DailyPay's deceptive treatment of its fees as not being interest deprives workers of interest-like calculations, such as APR, that are necessary to make comparative assessments of the cost of credit.

*Second*, the Company markets provision of on-demand or immediate Paycheck Advances that will enable employees to meet emergency expenses while simultaneously touting the "free" nature of its app and enrollment process (Pet. ¶¶ 38–41). And most of its advertising makes no mention at all of fees. (Pet. ¶¶ 42–45.) The Company thereby creates the net impression that

workers will be able to obtain Paycheck Advances immediately and for free even though it is impossible to receive funds on the same day without paying fees. (Pet. ¶¶ 38–46.) This is deceptive. *See People v. Orbital*, 169 A.D.3d at 566 (courts evaluate the overall impression made by respondent's advertising, acts, or practices to determine deceptiveness); *see FTC v. Crescent Pub. Grp., Inc.*, 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) (representations of "free tours" while visiting websites was false advertising when charges were later incurred from visiting those websites and consumers' reliance "on express claims" of no cost was "presumptively reasonable").

*Third*, DailyPay promotes its Paycheck Advance program as a benefit that will improve employees' financial health and wellbeing (Pet. ¶¶ 28–29), without a sound basis for any such claim (Pet. ¶¶ 30–31), and often contrary to what DailyPay knows about employees' addiction to Paycheck Advances (Pet. ¶¶ 26, 100). Remarkably, the Company warns prospective employers to be wary of DailyPay's competitors who offer "free" short-term loans to employees when they sign up for paycards because employees on average pay $300 per year in paycard fees. (Pet. ¶ 26.) Yet DailyPay markets itself to its own investors by touting its ability to extract ***$300 per year in fees on average*** from each employee that enrolls. (Pet. ¶ 100.) The Company's unsubstantiated claims of financial benefits and duplicitous double-speak are deceptive. *See Avola v. Louisiana-Pac. Corp.*, 991 F. Supp. 2d 381, 393–94 (E.D.N.Y. 2013) (deceptive acts or practices that can "reasonably influence the buyers and shape their expectations" are actionable).

## IV. DAILYPAY HAS REPEATEDLY AND PERSISTENTLY ENGAGED IN ABUSIVE ACTS AND PRACTICES THROUGH ITS PAYCHECK ADVANCES

The Consumer Financial Protection Act prohibits market participants who offer consumer financial products, such as DailyPay, from engaging in abusive acts and practices, which are those that either materially interfere with consumers' ability to understand a term or condition of a product or that take unreasonable advantage of (i) a consumer's inability to protect her own

15

interests in selecting or using a product or (ii) a consumer's reasonable reliance on a covered person

to act in her interests. 12 U.S.C. §§ 5481(5)–(6), 5531(d)(1)–(2). As established by the evidence

set forth in the Petition, DailyPay has engaged in repeated and persistent illegality, as required

under New York's Executive Law § 63(12), through its abusive acts or practices:

Material Interference. The failure to "prominently or clearly" convey the "consequential"

terms of a product or transaction, such as its "pricing or costs," can constitute an abusive act or

practice. Consumer Financial Protection Bureau, *Statement of Policy Regarding Prohibition on*

*Abusive Acts or Practices*, 88 Fed. Reg. 21883, 21885 (Apr. 12, 2023) (the "CFPB Policy Stmt.").

As shown in the Petition, DailyPay does not treat the fees it charges on Paycheck Advances as

interest and does not disclosure key cost metrics, such as APR, traditionally associated with

lending. These mischaracterizations not only are false (*see supra* 11–13), but the Company's

refusal to disclose APRs is abusive because it interferes with workers' ability to make "an informed

decision" about its loans by assessing costs or credit or evaluating compliance with state law, as

most workers "will be completely unaware of the details of their state's usury laws." *See NDG*

*Fin. Corp.*, 2016 WL 7188792 at *14–15 (finding abusiveness claim adequately pled based on

false representations that usurious loans were "valid and must be repaid"); *see also Pennsylvania*

*v. Think Fin., Inc.*, No. 14 Civ. 7139, 2019 WL 6217376, at *7 (E.D. Pa. Nov. 20, 2019) (falsely

holding out usurious loans "as legal would constitute an 'abusive' act").

The Company, meanwhile, speaks out of both sides of its mouth: DailyPay warns

employers not to sign up for advance programs that can result in employees paying fees of $300

per year on average (Pet. ¶ 26), while DailyPay tells its own investors that its "core" user base will

incur fees in excess of ***$300 per year*** on average. (Pet. ¶¶ 100.) These facts support a finding of

abusiveness. *See People v. Alta Colleges, Inc.*, No. 14 Civ. 3786, 2014 WL 4377579, at *2–3 (N.D.

16

Ill. Sep. 4, 2014) (abusiveness alleged where defendant promoted educational program while "knowing that most students will leave . . . without a degree or the hope of obtaining a well-paying job and with a debt"); *see also CFPB v. Access Funding, LLC*, No. 16 Civ. 3759, 2021 WL 2915118, at *27–28 (D. Md. Jul. 12, 2021) (abusiveness established by evidence "that at the time consumers" took advances they "did not appreciate the risks, costs, and conditions").

Inability to Protect. The Petition demonstrates how DailyPay promises workers—who themselves have no knowledge of historical DailyPay usage patterns—that its Paycheck Advance program will promote financial freedom. (Pet. ¶¶ 28–29.) In fact, the Company's business model makes workers dependent on its short-term loans to drive sufficient revenue through DailyPay's extraction of hundreds of dollars annually (Pet. ¶¶ 95–100)—a dependence it encourages through constant reminders to borrow (Pet. ¶ 110). As a result, the percentage of employees who obtain Paycheck Advances more than twice a week has steadily grown (Pet. ¶¶ 95–103), while the ten percent of most active borrowers are taking out new 240% APR Paycheck Advance every other day or more. (Pet. ¶ 108.) Yet the Company guarantees its own collection of amounts it lends and fees. (Pet. ¶ 92.) This makes DailyPay entirely indifferent to workers' financial struggles that result from paycheck depletion. *See CFPB v. Fifth Third Bank, N.A.*, No. 21 Civ. 262, 2023 WL 7325956, at *10–11 (S.D. Ohio Sep. 26, 2023) (alleged statements suggesting defendant was working to benefit consumers but in fact did not undertake efforts to do so sufficient for abusiveness).

In addition, the inability of a consumer to protect her own interests "relative to the excessively stronger" position of another can result in that party taking unreasonable advantage in an abusive manner. *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 919 (S.D. Ind. 2015). As shown in the Petition, DailyPay pushes its loans on workers by leveraging its contractual status as employers' exclusive lender (Pet. ¶ 32) and by forcing employees to forego alternative forms of

17

short-term credit in order to obtain Paycheck Advances. The Company then takes unreasonable advantage of its protected position to engage in high-cost lending. *See* CFPB Policy Stmt., 88 Fed. Reg. at 21888–89 (abusive to take advantage of "unequal bargaining power" where consumers "cannot elect to instead enter into a relationship with a competitor" or "cannot exercise meaningful choice in the selection or use of any particular entity as a provider").

       <u>Reasonable Reliance</u>. Federal law prohibits taking unreasonable advantage of consumers' reliance on trusted actors, such as students who reasonably rely on school staff to advise them on financial aid. *E.g.*, *ITT Educ. Servs., Inc.*, 219 F. Supp. 3d at 920. DailyPay preys on employees' reliance on their employers (who act as covered persons when promoting Paycheck Advances) to identify benefits to offer employees. The Company then takes advantage by pushing its high-cost loans while touting its role as a "partner" to employers (Pet. ¶¶ 35–37), using official channels of communication (Pet. ¶ 33), and speaking through employers directly (Pet. ¶ 35). *See CFPB v. Navient Corp.*, No. 17 Civ. 101, 2017 WL 3380530, at *19 (M.D. Pa. Aug. 4, 2017) (abusive acts found based on representations that lender would assist consumer in making informed decisions); *see also* CFPB Policy Stmt., 88 Fed. Reg. at 21889 (reasonable reliance exists "where an entity assumes the role of . . . helping [consumers] select providers in the market").

## V.   THE COURT SHOULD ORDER THE RELIEF SOUGHT IN THE PETITION

       The Court here has broad equitable power to grant the OAG's requested relief. *People v. Greenberg*, 27 N.Y.3d 490, 495–96 (2016); *Princess Prestige*, 42 N.Y.2d at 107.

### A.   The Court Should Permanently Enjoin DailyPay's Paycheck Advance Program and its Deceptive Marketing of Interest-Free Loans

       Courts exercising Executive Law § 63(12)'s remedial powers routinely grant injunctive relief to prohibit future fraudulent or illegal conduct. *E.g.*, *Princess Prestige*, 42 N.Y.2d at 107–08; *People v. Daro Chartours, Inc.*, 72 A.D.2d 872, 872–73 (3rd Dep't 1979). Here, the Court

should enjoin DailyPay from: (i) accepting wage assignments for fees that exceed eighteen percent; (ii) charging and collecting interest that exceeds sixteen percent; and (iii) marketing Paycheck Advances as being interest free, for immediate expenses without any cost, or as financially beneficial. *See, e.g.*, *People v. Richmond Capital Group LLC*, 80 Misc. 3d 1213(A), at 2, 16 (Sup. Ct. 2023) (enjoining usurious lender from future lending and collections practices); *People v. Nationwide Asset Servs., Inc.*, 26 Misc. 3d 258, 281–82 (Sup. Ct. 2009) (enjoining respondents from claiming "that consumers utilizing their services typically save 25% to 40% of their debt" and "misrepresenting the dollar amount and percentages").

### B.    The Court Should Order an Accounting and Direct DailyPay to Provide Restitution and Damages, with Interest, to All Affected Consumers

Once liability is shown, the Court should award restitution and damages, *Princess Prestige*, 42 N.Y.2d at 107–08, which need not be limited to complaining consumers but should be awarded to those "known and unknown." *Scottish-Am. Ass'n*, 52 A.D.2d at 528; *see People v. Beach Boys Equip. Co.*, 273 A.D.2d 850, 851 (4th Dep't 2000) (same). The purpose of such an award is not solely to compensate but also "to deter future" misconduct. *Greenberg*, 95 A.D.3d at 481.

Here, DailyPay collected Paycheck Advances and fees via wage assignment (Pet. ¶ 53), but the law is clear that "only wage assignments made pursuant to Article 3-A are collectable." *Bond*, 494 F.2d at 308–09. Thus, DailyPay should forfeit all amounts collected as restitution or damages. *See Sistenstein*, 138 Misc. 2d 140, 145–46 (awarding "return from [the assignee] of the wages paid" under illegal assignment, which was "a nullity" under Article 3-A).

Alternatively, DailyPay's usurious Paycheck Advances were void, requiring "the complete forfeiture of principal and interest"—a "harsh" outcome that reflects the "consistent condemnation of the evils of usury." *Adar Bays*, 37 N.Y.3d at 330–32; *see* 72 N.Y. Jur. 2d § 142 (assignments "wherein the interest and other charges . . . exceed the prescribed statutory rate [are] void and

19

invalid"). DailyPay was legally entitled to collect "neither principal nor interest." *Hammelburger v. Fourson Inn Corp.*, 54 N.Y.2d 580, 591 (1981). Thus, every cent of interest paid by workers on usurious Paycheck Advances was a cent that they were not legally obligated to pay, resulting in injuries for which damages are appropriate. *See Richmond Capital*, 80 Misc. 3d 1213(A) at 2, 16 (ordering lender to "pay full restitution and damages" in the form of all interest collected); *see also People v. 21st Century Leisure Spa Int'l Ltd.*, 153 Misc. 2d 938, 945 (Sup. Ct. 1991) (ordering damages in the amount of all payments arising from illegal and fraudulent conduct).

Finally, DailyPay continued to make hundreds of thousands of usurious loans between the end of the Data Period and the Petition, and the Company likely will make thousands more between filing and any final judgment. "The authority to direct restitution includes the authority to order" actions to facilitate restitution, such as notifying consumers "of the right to seek restitution" or providing an accounting to identify all harm. *Gen. Elec. Co.*, 302 A.D.2d at 316; *see also People v. Veleanu*, 89 A.D.3d 950, 951 (2d Dep't 2011) (affirming order of restitution with accounting); *Telehublink*, 301 A.D.2d at 1007 (same). To facilitate complete restitution and damages, the Court should order DailyPay to account for all Paycheck Advances made to New Yorkers since the end of the Data Period and award restitution and damages. *See Richmond Capital*, 80 Misc. 3d 1213(A) at 16 (ordering usurious lender to "provide an accounting to the Petition of the names and addresses" of borrowers "and a complete history of all monies collected or received").

### C. The Court Should Award Penalties and Costs to the OAG

The OAG also is authorized to seek civil penalties of up to $5,000 for each violation of Article 22-A, GBL § 350-d, and of up to $5,000 per day for violations of the Consumer Financial Protection Act, up to $25,000 per day for reckless violations, and up to $1 million per day for knowing violations, 12 U.S.C. § 5565(c)(2)(A)–(C). Courts routinely award such penalties in civil enforcement actions such as this proceeding. *See, e.g.*, *Telehublink*, 301 A.D.2d at 1009; *People*

20

*v. Wilco Energy Corp.*, 284 A.D.2d 469, 471 (2d Dep't 2001); *see also People v. World Interactive Gaming Corp.*, 185 Misc. 2d 852, 856–65 (Sup. Ct. 1999) (awarding "penalties and costs" under the Executive Law for violations of "federal and state laws prohibiting gambling").

The purpose of civil penalties in OAG enforcement actions, which are paid to the State, is to deter future violations and punish illegal conduct, not to compensate. *Meyers Bros. Parking Sys. v. Sherman*, 87 A.D.2d 562, 563 (1st Dep't 1982), *aff'd*, 57 N.Y.2d 653 (1982). The penalty should not be so small as to merely represent a cost of doing business; to the contrary, the penalty should be large enough to serve "as a warning to discourage the prohibited act." *Id.* Here, the OAG seeks to submit a proposed penalty following receipt of DailyPay's accounting.

Finally, CPLR § 8303(a)(6) provides for an award to the OAG of "a sum not exceeding two thousand dollars against each defendant" in a special proceeding brough under New York's Executive Law. The Court should grant costs here, as courts routinely do. *E.g.*, *Daro Chartours*, 72 A.D.2d at 873; *People v. Midland Equities*, 117 Misc. 2d 203, 208 (Sup. Ct. 1982).

21

Case 1:25-cv-03439-JGK     Document 1-13     Filed 04/25/25     Page 65 of 71

## **CONCLUSION**

For the foregoing reasons, the Court should make a summary determination in Petitioner's

favor and grant injunctive relief, an accounting, and all financial relief sought.

Dated: April 14, 2025                    Respectfully submitted,

                                         LETITIA JAMES
                                         Attorney General of the State of New York


                                         By: _____
                                         Christopher L. Filburn
                                         *Assistant Attorney General*
                                         Bureau of Consumer Frauds & Protection
                                         28 Liberty Street, 20th Floor
                                         New York, New York 10005
                                         Tel.: 212.416.8303
                                         Email: christopher.filburn@ag.ny.gov

                                         Of counsel:

                                         Jane M. Azia
                                         *Bureau Chief*

                                         Laura J. Levine
                                         *Deputy Bureau Chief*

                                         *Counsel for Petitioner People*
                                         *of the State of New York*

## CERTIFICATION

CHRISTOPHER L. FILBURN, an attorney duly admitted to practice before the courts of the State of New York, affirms the following under penalty of perjury:

1.    I am an Assistant Attorney General in the New York State Office of the Attorney General. I am assigned to the Bureau of Consumer Frauds and Protection.

2.    The foregoing Memorandum of Law complies with the word count limit set forth in Rule 202.8-b, as it contains 6,977 words excluding the parts exempted by the Rule, as indicated by the "Word Count" feature of Microsoft Word.

Dated: April 14, 2025
New York, New York

_____
Christopher L. Filburn
Assistant Attorney General



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF ECONOMIC JUSTICE
CONSUMER FRAUDS & PROTECTION BUREAU

## NO-FEE AUTHORIZATION LETTER

April 14, 2025

**<u>BY NYSCEF</u>**
Clerk of the Court
Supreme Court, New York County
60 Centre Street
New York, NY 10007

*People of the State of New York v. DailyPay, Inc.*

Dear Clerk of the Court:

Please waive collection of fees for the New York State Office of the Attorney General in connection with the above-captioned action. The Office is exempt from the payment of fees under New York Executive Law § 161(2) and CPLR 8017.

Respectfully Submitted,

LETITIA JAMES
Attorney General of the State of New York

By: _____
Christopher L. Filburn
Assistant Attorney General
Bureau of Consumer Frauds and Protection
christopher.filburn@ag.ny.gov
212.416.8303



UCS-840
(rev. 12/16/2024)

# REQUEST FOR JUDICIAL INTERVENTION

Supreme COURT, COUNTY OF New York

Index No: _____    Date Index Issued: _____

| CAPTION    Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet. | For Court Use Only: |
|---|---|
| People of the State of New York, by Letitia James, Attorney General of the State of New York | **IAS Entry Date** |
| Plaintiff(s)/Petitioner(s) | **Judge Assigned** |
| -against- | |
| DailyPay, Inc. | **RJI Filed Date** |
| Defendant(s)/Respondent(s) | |

## NATURE OF ACTION OR PROCEEDING:    Check only one box and specify where indicated.

**COMMERCIAL**
- ☐ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ☐ Contract
- ☐ Insurance (where insurance company is a party, except arbitration)
- ☐ UCC (includes sales and negotiable instruments)
- ☐ Other Commercial (specify): _____

*NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C).*

**TORTS**
- ☐ Asbestos
- ☐ Environmental (specify): _____
- ☐ Medical, Dental or Podiatric Malpractice
- ☐ Motor Vehicle
- ☐ Products Liability (specify): _____
- ☐ Other Negligence (specify): _____
- ☐ Other Professional Malpractice (specify): _____
- ☐ Other Tort (specify): _____

**SPECIAL PROCEEDINGS**
- ☐ Child-Parent Security Act (specify): ☐ Assisted Reproduction ☐ Surrogacy Agreement
- ☐ CPLR Article 75 - Arbitration    [see *NOTE* in **COMMERCIAL** section]
- ☐ CPLR Article 78 - Proceeding against a Body or Officer
- ☐ Election Law
- ☐ Extreme Risk Protection Order
- ☐ MHL Article 9.60 - Kendra's Law
- ☐ MHL Article 10 - Sex Offender Confinement (specify):    ☐ Initial    ☐ Review
- ☐ MHL Article 81 (Guardianship)
- ☐ Other Mental Hygiene (specify): _____
- ☒ Other Special Proceeding (specify): Executive Law 63(12)

**MATRIMONIAL**
- ☐ Contested
  **NOTE:** If there are children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum (UCS-840M)**.
  *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (UD-13).*

**REAL PROPERTY**    Specify how many properties the application includes: _____
- ☐ Condemnation
- ☐ Mortgage Foreclosure (specify):    ☐ Residential    ☐ Commercial
  Property Address: _____
  **NOTE:** For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the **FORECLOSURE RJI ADDENDUM (UCS-840F)**.
- ☐ Partition
  **NOTE:** Complete and attach the **PARTITION RJI ADDENDUM (UCS-840P)**.
- ☐ Tax Certiorari (specify):    Section: _____ Block: _____ Lot: _____
- ☐ Tax Foreclosure
- ☐ Other Real Property (specify): _____

**OTHER MATTERS**
- ☐ Certificate of Incorporation/Dissolution    [see *NOTE* in **COMMERCIAL** section]
- ☐ Emergency Medical Treatment
- ☐ Habeas Corpus
- ☐ Local Court Appeal
- ☐ Mechanic's Lien
- ☐ Name Change/Sex Designation Change
- ☐ Pistol Permit Revocation Hearing
- ☐ Sale or Finance of Religious/Not-for-Profit Property
- ☐ Other (specify): _____

## STATUS OF ACTION OR PROCEEDING    Answer YES or NO for every question and enter additional information where indicated.

|  | YES | NO |  |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ☐ | ☒ | If yes, date filed: _____ |
| Has a summons and complaint or summons with notice been served? | ☐ | ☒ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ☐ | ☒ | If yes, judgment date: _____ |

## NATURE OF JUDICIAL INTERVENTION    Check one box only and enter additional information where indicated.

- ☐ Infant's Compromise
- ☐ Extreme Risk Protection Order Application
- ☐ Note of Issue/Certificate of Readiness
- ☐ Notice of Medical, Dental or Podiatric Malpractice    Date Issue Joined: _____
- ☐ Notice of Motion    Relief Requested: _____    Return Date: _____
- ☒ Notice of Petition    Relief Requested: Judgment - Declaratory    Return Date: 05/08/2025
- ☐ Order to Show Cause    Relief Requested: _____    Return Date: _____
- ☐ Other Ex Parte Application    Relief Requested: _____
- ☐ Partition Settlement Conference
- ☐ Request for Preliminary Conference
- ☐ Residential Mortgage Foreclosure Settlement Conference
- ☐ Waiver of Court Costs, Fees and Expenses
- ☐ Writ of Habeas Corpus
- ☐ Other (specify): _____

1 of 2

| RELATED CASES | List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**. | | | |
|---|---|---|---|---|
| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| PARTIES | | For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**. | | |
|---|---|---|---|---|
| Un-Rep | **Parties** List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | **Attorneys and Unrepresented Litigants** For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | **Issue Joined** For each defendant, indicate if issue has been joined. | **Insurance Carriers** For each defendant, indicate insurance carrier, if applicable. |
| ☐ | Name: People of the State of New York, by Letitia James, Attorney Ge... Role(s): Plaintiff/Petitioner | CHRISTOPHER FILBURN, OFFICE OF THE ATTORNEY GENERAL, BUREAU OF CONSUMER FRAUDS & PROTECTION, 28 LIBERTY ST FL 20 , NEW YORK, NY 10005, christopher.filburn@ag.ny.gov | ☐ YES  ☒ NO | |
| ☐ | Name: DailyPay, Inc. Role(s): Defendant/Respondent | Marcus Asner, Arnold & Porter Kaye Scholer LLP, 250 W. 55th Street, New York, NY  10019 | ☐ YES  ☒ NO | |
| ☐ | Name: Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name: Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name: Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name: Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name: Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name: Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name: Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name: Role(s): | | ☐ YES  ☐ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER  RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated:    04/14/2025                                          CHRISTOPHER LEE FILBURN
                                                                              Signature

          4819850                                                CHRISTOPHER LEE FILBURN
   Attorney Registration Number                                      Print Name

Case 1:25-cv-03439-JGK    Document 1-13    Filed 04/25/25    Page 70 of 71

# Request for Judicial Intervention Addendum

Supreme COURT, COUNTY OF New York

**Index No:**

UCS-840A (7/2012)

**For use when additional space is needed to provide party or related case information.**

**PARTIES:**  For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

| Un-Rep | Parties<br><br>List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants<br><br>For represented parties, provide attorney's name, firm name, address, phone and email.  For unrepresented parties, provide party's address, phone and email. | Issue Joined<br><br>For each defendant, indicate if issue has been joined. | Insurance Carriers<br><br>For each defendant, indicate insurance carrier, if applicable. |
|---|---|---|---|---|
| ☐ | Name: People of the State of New York, by Letitia James, Attorney General of the State of New York<br>Role(s): Plaintiff/Petitioner | CHRISTOPHER FILBURN, OFFICE OF THE ATTORNEY GENERAL, BUREAU OF CONSUMER FRAUDS & PROTECTION, 28 LIBERTY ST FL 20 , NEW YORK, NY 10005, christopher.filburn@ag.ny.gov | ☐ YES  ☒ NO | |

**RELATED CASES:**    List any related actions. For Matrimonial actions, include any related criminal and/or Famiy Court cases.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

PEOPLE OF THE STATE OF NEW YORK,
by LETITIA JAMES, Attorney General of the State of
New York,

                   Petitioner,

     - against -

DAILYPAY, INC.,

                  Respondent.

**AFFIRMATION OF SERVICE**

Index No. 154851/2025

CHRISTOPHER L. FILBURN, an attorney duly admitted to practice before the courts of

the State of New York, affirms the following under penalty of perjury:

I am an Assistant Attorney General in the New York State Office of the Attorney General,

I am over eighteen years of age, and I am not a party to this action. On April 15, 2025, Yiqing Shi

of Arnold & Porter Kay Scholer LLP, counsel for Respondent, confirmed by email that her firm

was authorized to accept service by email on behalf of Respondent in this action. That same day,

I served true and correct copies of the following documents by email to Ms. Shi and her firm:

Verified Petition; Notice of Petition; Affirmation of Christopher L. Filburn, and exhibits;

Memorandum of Law in Support; No-Fee Letter; Request for Judicial Intervention; and a Notice

of Electronic Filing. Ms. Shi replied by email later that day to confirm receipt of service.

Dated: April 16, 2025
     New York, New York

By: _____
    Christopher L. Filburn
    *Assistant Attorney General*
    Bureau of Consumer Frauds & Protection
    28 Liberty Street, 20th Floor
    New York, New York 10005
    Tel.: 212.416.8303
    Email: christopher.filburn@ag.ny.gov